**Teresa XUNCAX, Juan Diego–Francisco, Juan Doe, Elizabet Pedro–Pascual, Margarita Francisco–Marcos, Francisco Manuel–Mendez, Juan Ruiz Gomez, Miguel Ruiz Gomez, and Jose Alfredo Callejas, Plaintiffs,**

v.

**Hector GRAMAJO, Defendant.**

**Dianna ORTIZ, Plaintiff,**

v.

**Hector GRAMAJO, Defendant.**

**Civ. A. Nos. 91–11564–DPW, 91–11612–DPW.**

United States District Court, D. Massachusetts.

April 12, 1995.

---

Harvey Kaplan, Jeremiah Friedman, Kaplan, O'Sullivan & Friedeman, Boston, MA, Beth Stephens, Michael Ratner, Center for Constitutional Rights, New York City, for plaintiff Dianna Ortiz.

Harvey Kaplan, Jeremiah Friedman, Maureen O'Sullivan, Kaplan, O'Sullivan & Friedeman, Boston, MA, Beth Stephens, Michael

Ratner, Jose L. Morin, David Cole, Center for Constitutional Rights, New York City, James F. Smith, Michael R. Snedeker, Snedeker & Smith, Oakland, CA, Todd Howland, El Rescate Legal Services, Los Angeles, CA, Harold Hongju Koh, Lowenstein International Human Rights Clinic, New Haven, CT, for plaintiffs in Civ.A. No. 91–11564–DPW.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................169
II. FACTUAL BACKGROUND .........................................169
 A. The Xuncax Complaint: Civil Action No. 91–11564 ......................169
 1. The Plaintiffs' Ordeals ...........................................169
 a. Teresa Xuncax ........................................169
 b. Juan Diego–Francisco ..........................................169
 c. Juan Doe .......................................170
 d. Elizabet Pedro–Pascual.......................................170
 e. Margarita Francisco–Marcos ...............................170
 f. Francisco Manuel–Mendez.......................................170
 g. Juan and Miguel Ruiz–Gomez ...................................171
 h. Jose Alfredo Callejas ........................................171
 2. The Defendant's Responsibility ...................................171
 B. The Ortiz Complaint: Civil Action No. 91–11612 ......................173
 1. The Plaintiff's Ordeal...........................................173
 2. The Defendant's Responsibility ...................................174
III. DISCUSSION ..................................................175
 A. Foreign Sovereign Immunities Act ..................................175
 B. Independent Federal Subject Matter Jurisdiction in Ortiz v. Gramajo, Civil Action No. 91–11612 ........................................176
 1. Torture Victim Protection Act of 1991 .............................176
 2. Retroactivity ....................................................176
 3. Plaintiff Ortiz's Claim Under TVPA ...............................178
 C. Independent Federal Subject Matter Jurisdiction Under 28 U.S.C. § 1350 in Xuncax et al. v. Gramajo, Civil Action No. 91–11564 .................178
 1. The Scope of § 1350 ..............................................179
 a. The *Filartiga* Approach .........................................179
 b. The Domestic Law Alternative Approach ........................181
 c. Conclusion .....................................................183
 2. Xuncax Plaintiffs' Claims of Violations of International Law ..........184
 a. Peremptory Norms of International Law ........................184
 b. Claims on Behalf of Third Parties .............................189
 c. Statute of Limitations and Venue ..............................192
 D. Independent Federal Subject Matter Jurisdiction Under 28 U.S.C. § 1331.....193
 E. Xuncax and Ortiz Plaintiffs' Municipal Tort Claims ......................194
 1. Supplemental Jurisdiction ........................................194
 2. Choice of Law ....................................................195
 3. Defendant's Liability Under Guatemalan Law for Wrongful Death, Assault and Battery, False Imprisonment, and Intentional Infliction of Emotional Distress ...........................................196
 4. Plaintiff Ortiz's Claim for Defamation ..............................197
IV. ASSESSMENT OF DAMAGES......................................197
 A. Xuncax Plaintiffs' Claims Under International Law ......................197
 B. Ortiz's Claims Under the TVPA ....................................198
 1. Compensatory Damages...........................................198
 2. Punitive Damages ................................................199
 C. Plaintiffs' Claims Under Guatemalan Municipal Law ....................200
 1. Compensatory Damages...........................................200
 2. Punitive Damages ................................................201
 D. Ortiz's Defamation Claim Under Kentucky Law .........................202
V. CONCLUSION ..................................................202

*MEMORANDUM*

WOODLOCK, District Judge.

## I. INTRODUCTION

Nine expatriate citizens of Guatemala, as plaintiffs in Civil Action No. 91–11564, and Dianna Ortiz, a citizen of the United States, as plaintiff in Civil Action No. 91–11612, have brought separate actions against Hector Gramajo, formerly Guatemala's Minister of Defense. The plaintiffs seek compensatory and punitive damages for devastating injuries they suffered from conduct of Guatemalan military forces. The plaintiffs allege that the defendant Gramajo bears personal responsibility for the numerous acts of gruesome violence inflicted by military personnel who were under his direct command.

The complaints were served upon the defendant while he was in this country attending Harvard University's Kennedy School of Government. After filing a conclusory *pro se* answer, the defendant declined to participate further in these proceedings by refusing even to respond to court orders requiring him to furnish a current address for service. Default has been entered against the defendant pursuant to Fed.R.Civ.P. 55(a).

The facts alleged and adduced by the plaintiffs' affidavits stand uncontroverted in light of the default. *Thomson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885); *see also Pope v. United States*, 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944). The questions presented are (1) whether this Court may render judgment against the defendant and (2) if so, what damage award constitutes a proper measure of the defendant's legal liability.

The several claims of the plaintiffs present complex jurisdictional and factual questions. Answering those questions has been made extraordinarily difficult because, while plaintiffs' contentions have been presented with exceptional skill by exceedingly competent counsel, defendant has offered no defense. After extended consideration necessary to explore—without adversarial assistance—the potential defenses available I have concluded that, with the exception of one of the plaintiffs in Civil Action No. 91–11564, this Court has jurisdiction to render judgment for substantial monetary damages.

## II. FACTUAL BACKGROUND

### A. *The Xuncax Complaint: Civil Action No. 91–11564*

#### 1. The Plaintiffs' Ordeals

Plaintiffs Teresa Xuncax, Juan Diego–Francisco, Juan Doe, Elizabet Pedro–Pascual, Margarita Francisco–Marcos, Francisco Manuel–Mendez, Juan Ruiz–Gomez, Miguel Ruiz–Gomez, Jose Alfredo Callejas [the "Xuncax plaintiffs"] are all natives of Guatemala; eight are Kanjobal Indians. All fled the country as a direct result of the abuses inflicted upon them or their family members. All were victimized by the Guatemalan military forces, who ransacked their villages and engaged in brutal and barbarous practices. Some of the plaintiffs were themselves subjected to torture and arbitrary detention; others were forced to watch as their family members were tortured to death or summarily executed; one plaintiff's father was caused to "disappear."

All of the plaintiffs assert that they have been exiled from their native country and, with record support, that they suffer from severe psychological disorders and disturbances due to the brutal nature of the traumas inflicted upon them. They bring suit to recover compensatory and punitive damages for their various claims against the defendant under international law, United States law, and municipal tort laws. Briefly stated, the respective allegations are as follows:[1]

**a. Teresa Xuncax:** On July 18, 1982, soldiers broke into Xuncax's house, stripped, bound and masked her husband, who had spent time working in the United States. They beat him and kicked him, dragged him outside and walked him naked through the

---

1. The summaries given above are taken from affidavits submitted by each of the Xuncax plaintiffs. *See* Xuncax Plaintiffs' Exhibits A–I.

village with other captured Kanjobal men. Xuncax took her children that afternoon and fled on foot to Mexico. That evening, the soldiers executed Xuncax's husband. For the next three years, Xuncax and her children lived in refugee camps in Mexico. Settled now in Sacramento, California, Xuncax is afraid to return to Guatemala and has applied for political asylum.

**b. Juan Diego–Francisco:** On July 6, 1982, upon Diego–Francisco's return from work in the United States, 300 soldiers entered his village, broke into his house, grabbed him, tied him and began to interrogate him. They beat him with their hands and guns and beat his wife as well. For the next fourteen hours, the soldiers took turns interrogating and torturing him, putting him inside thick plastic bags and holding a knife to his head. After finally being released, he left for Mexico that same day with his wife. Later he learned that three of his cousins had been executed and his house burned down. He has since settled in California and, afraid to return to Guatemala, has applied for political asylum.

**c. Juan Doe:** In July of 1982, when Doe was nine years old, soldiers came to his village, seized his father and six other men and, after holding them for two days, drove them in a truck to a military post five miles away. Doe and some relatives followed the truck. He saw the prisoners taken into an open yard and questioned; he saw his father beaten and kicked; he saw the soldiers make the prisoners walk on broken glass, put heated iron to their feet, and stick needles under their finger and toe nails. They then began to mutilate the prisoners, severing flesh and body parts, cutting pieces from Doe's father's chest, back and arms; they shot the prisoners in the legs and beat them to make them try to stand. At length, forcing the prisoners over to a large hole filled with burning mattresses and cardboard, the soldiers began to throw the prisoners in one by one; Doe saw his father's burnt body in the hole. Returning home, he found his house burned down and his mother and siblings gone. Believing them dead and fearing for his life, he left Guatemala the next day. For the next five years he worked as a field hand in Mexico, staying on the move to avoid Mexican immigration and raids by the Guatemalan army. Now settled with relatives in California, he has learned that his mother and siblings are still alive. However, hearing reports that the army is threatening his brothers, he remains afraid to return and, for their safety, is using an assumed name in this lawsuit.

**d. Elizabet Pedro–Pascual:** In July of 1982, Pedro–Pascual's older sister was shot and beheaded by soldiers while visiting a neighboring village. Later, learning that the soldiers were nearing her town, she and her family fled to Mexico. In 1990, she arrived in the United States and, fearing for her life should she return to Guatemala, has applied for political asylum.

**e. Margarita Francisco–Marcos:** In December of 1982, when Francisco–Marcos was ten, soldiers seized her uncle; he has not been seen since. A week later, 800 soldiers came into her village; they ransacked her house, threatened her family, and left with prisoners. They returned the next day, marched the prisoners around and beat them. One soldier terrorized a woman who lived next door. Two days later, fearing the soldiers' return, Francisco–Marcos and her parents fled on foot to Mexico. For six years they remained in Mexico, fearful and always on the move, frequently attacked by the Guatemalan army and sometimes separated. After arriving in the United States, Francisco–Marcos applied for political asylum in 1989.

**f. Francisco Manuel–Mendez:** In July of 1982, Manuel–Mendez' cousin passed through his village on her way to Mexico with her children; she had been forced to flee after soldiers had destroyed her home and taken her husband away. Over the previous six months, Manuel–Mendez had heard similar tales of villages being burned and young men killed—including two of his cousins—from a growing stream of refugees. He himself had seen the smoke and had pulled bodies from the river. Fearing a similar fate, Manuel–Mendez fled on foot with his wife and children to Mexico. After seven years of living in refugee camps in Mexico, they reached the United States in 1990 and applied for political asylum.

**g. Juan and Miguel Ruiz–Gomez:** In October of 1982, the ranch where brothers Juan and Miguel Ruiz–Gomez worked and lived with their families was bombed from the air as forty soldiers approached in jeeps and trucks. Fearing for their lives, they fled to Mexico where for several years they lived itinerant lives of fear and deprivation. They lost friends in the soldiers' attacks and were separated from family members. After many hardships, they reached the United States in 1990 and they have applied for political asylum.

**h. Jose Alfredo Callejas:** In November of 1988, soldiers tortured, mutilated and killed 21 civilians in the village near Callejas' home where his father lived. Among the victims were his brother Luis and several cousins, whose abused bodies he saw. Following this massacre, the Army pressured survivors to say that it was not the Army, but "guerillas" who had been responsible. Knowing otherwise, Callejas, his brother Baldomero and his father spoke out to human rights workers. Months later, soldiers questioned Callejas' father about his claims that the Army was responsible, and Callejas began to receive anonymous threatening letters as well as Army notices that he was to report for questioning. Having heard that his name was on an Army death list, he did not report. In June of 1989, soldiers abducted his father, whom he has not seen since and presumes dead. In May of 1990, soldiers threw a hand grenade at him outside his home, wounding him and frightening his wife and daughters inside. In August of 1990, he met again with human rights attorneys, telling them that the Army had killed his father and showing them where the grenade was thrown. A few days later, in September of 1990, he was shot at by men in a car with a machine gun. Narrowly escaping, he sought asylum at the Canadian embassy with his wife and family and thereafter left for Canada. In December of 1991, he heard that his brother Baldomero, after being harassed by Army intelligence, had been murdered. He feels responsible for the deaths of his father and brother, wishes he could bury his father properly, and longs for his life and family in Guatemala where he was self-sufficient.

**2. The Defendant's Responsibility**

The plaintiffs allege that the defendant Gramajo, as Vice Chief of Staff and director of the Army General Staff from March of 1982 through 1983, as commander from July through December of 1982 of the military zone in which the plaintiffs resided, and as Minister of Defense from 1987 through 1990, was personally responsible for ordering and directing the implementation of the program of persecution and oppression that resulted in the terrors visited upon the plaintiffs and their families. (Nairn Aff., Xuncax Ex. L.) I find their allegations supported by the record. I also find that Gramajo may be held liable for the acts of members of the military forces under his command.

In *Application of Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946), the commander of Japanese armed forces in the Philippine Islands during World War II was held responsible for numerous acts of atrocity committed by servicemembers under his command. The allegations contained in the prosecution's Bill of Particulars against Yamashita are eerily parallel to those made here:

> "a deliberate plan and purpose to massacre and exterminate a large part of the civilian population of Batangas Province, and to devastate and destroy public, private and religious property therein, as a result of which more than 25,000 men, women and children, all unarmed noncombatant civilians, were brutally mistreated and killed, without cause or trial, and entire settlements were devastated and destroyed wantonly and without military necessity."

327 U.S. at 14, 66 S.Ct. at 347. The Court upheld Yamashita's conviction by a United States military tribunal, explaining:

> It is not denied that such acts directed against the civilian population of an occupied country and against prisoners of war are recognized in international law as violations of the law of war. But it is argued that the charge does not allege that petitioner has either committed or directed the commission of such acts, and consequently that no violation is charged as against him.

But this overlooks the fact that the gist of the charge is an unlawful breach of duty by petitioner as an army commander to control the operations of the members of his command by "permitting them to commit" the extensive and widespread atrocities specified....

It is evident that the conduct of military operations by troops whose excesses are unrestrained by the orders or efforts of their commander would almost certainly result in violations which it is the purpose of the law of war to prevent.... Hence the law of war presupposes that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates.

327 U.S. at 14–15, 66 S.Ct. at 347–48 (citation to Hague Convention omitted).

In *Forti v. Suarez–Mason*, 672 F.Supp. 1531 (N.D.Cal.1987), the court held an Argentine General responsible for acts of brutality committed by military personnel in the defense zone under his command. The court explained:

Although the individual acts are alleged to have been committed by military and police officials, plaintiffs allege that these actors were all agents, employees, or representatives of defendant acting pursuant to a "policy, pattern and practice" of the First Army Corps under defendant's command. Plaintiffs assert that the defendant "held the highest position of authority" in Buenos Aires Province; that defendant was responsible for maintaining the prisons and detention centers there, as well as the conduct of Army officers and agents; and that he "authorized, approved, directed and ratified" the acts complained of.

672 F.Supp. at 1537–38 (citation omitted).

In enacting the Torture Victim Protection Act of 1991,[2] Congress apparently endorsed this approach. As the Senate Committee Report explained:

The legislation is limited to lawsuits against persons who ordered, abetted, or assisted in the torture. It will not permit a lawsuit against a former leader of a country merely because an isolated act of torture occurred somewhere in that country. However, a higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

S.Rep. No. 249, 102d Cong., 1st Sess. 9 (1991) (footnote omitted). The Senate Committee Report used *Yamashita* and *Forti I* to illustrate this principal of "command responsibility:"

... although Suarez Mason was not accused of directly torturing or murdering anyone, he was found civilly liable for those acts which were committed by officers under his command about which he was aware and which he did nothing to prevent.

Similarly, in In re *Yamashita*, the Supreme Court held a general of the Imperial Japanese Army responsible for a pervasive pattern of war crimes committed by his officers when he knew or should have known that they were going on but failed to prevent or punish them. Such "command responsibility" is shown by evidence of a pervasive pattern and practice of torture, summary execution or disappearances.[3]

*Id.* (citation and one footnote omitted) (footnote in original).

In this case, plaintiffs have convincingly demonstrated that, at a minimum, Gramajo was aware of and supported widespread acts of brutality committed by personnel under his command resulting in thousands of civilian deaths. (*See* Manuel Aff. at 7–16, Ortiz Ex. F; Nairn Aff. at 5–8, 10–11, Ortiz Ex.

---

2. Although only plaintiff Ortiz directly raises a TVPA claim, the legislative history of the TVPA also casts light on the scope of the Alien Tort Claims Act, on which jurisdiction in the *Xuncax* action is based. *See* Part III.C.1, *infra*.

3. "As the opinion of the Tokyo War Crimes Trial tribunal explained 'that crimes are notorious, numerous and widespread as to time and place are matters to be considered in imputing knowledge.'" S.Rep. at 9 (citation omitted).

G.) [4] Gramajo refused to act to prevent such atrocities. When publicly confronted with the murder of innocent civilians by soldiers under his command, Gramajo "did not deny the stated facts. He instead replied that he saw his actions as appropriate and involving the use of 'flexible' and 'humanitarian' tactics." (Nairn Aff. at 13.) In the face of public outcry, "the massacres continued and indeed got worse." (Nairn Aff. at 14 (reporting from personal observation).)

Indeed, the evidence suggests that Gramajo devised and directed the implementation of an indiscriminate campaign of terror against civilians such as plaintiffs and their relatives. As reported by Allan Nairn:

> Gramajo's field commanders were, as one described it to me, "on a very tight leash." They received daily orders stating which villages they were to strike and when. They maintained hourly radio contact with provincial army headquarters during which they received constant updates on their orders and reported back the results (including body counts) of what transpired in each village. Each day's activities were recorded for inspection by Gramajo and his subordinates in a daily Diary of Operations which was—according to the established procedures—reviewed with each field commander in a weekly meeting. Gramajo also, by his own description, travelled throughout the highlands to personally supervise the field commanders.

> . . . . .

> Field commanders also received lists of individuals to be eliminated in each village.... The lists came from G–2, the army intelligence section, which operated at this time under Gramajo's direct supervision.

(Nairn Aff. at 8–9, 7 (reporting soldiers told him "the killing and the torture was preplanned, systematized, and carried out with a political objective under strict military discipline").) In addition, Nairn was told by "a

well informed source on the Guatemalan army" that "Gramajo was the officer putting together the rural program and that he was 'the brains' and 'the intellectual author' of the operation." (Nairn Aff. at 10, 15–17.)

### B. The Ortiz Complaint: Civil Action No. 91–11612

Plaintiff Dianna Ortiz, an Ursuline nun and a citizen of the United States, was kidnapped, tortured and subjected to sexual abuse in Guatemala by personnel under Gramajo's command. When word of her treatment became public, Gramajo defamed her by falsely asserting her injuries were inflicted by an angry lover. Devastated and scarred by her ordeal, Ortiz brings this action, seeking compensatory and punitive recovery against Gramajo for his violations of international law, United States statutory law, and the municipal tort laws of various jurisdictions.

### 1. The Plaintiff's Ordeal

From 1987 through 1989, Ortiz was engaged in missionary work with the Kanjobal Indians of Guatemala in a poor rural parish in Huehuetenango. (Ortiz Aff. ¶¶ 1, 2.) In late 1988, nearly a year after her arrival, Sister Ortiz began to receive anonymous written threats and warnings, accusing her (and other nuns) of planning to meet with "guerrillas," telling her that she was in danger and should leave Guatemala. *Id.* at ¶¶ 7–11. In July 1989, a man accosted her on a street in Guatemala City, threatening her and again telling her to leave the country. Frightened by this experience, Ortiz left Guatemala for two months, but then returned to resume her work. *Id.* at ¶¶ 16–18. Upon her return, the written threats and warnings resumed. *Id.* at ¶¶ 19–21.

Then, on November 2, 1989, while in the garden of a religious retreat center in Antigua, Ortiz was kidnapped by two men with a gun, one of whom was the man who had accosted her in Guatemala City. *Id.* at

---

**4.** Plaintiffs often rely on multiple levels of hearsay to demonstrate Gramajo's responsibility. Unless an affiant reports an admission by Gramajo (or by a soldier in Gramajo's command concerning the soldier's duties or actions) that

the affiant personally heard, I use such statements only to show that Gramajo had reason to know of widespread atrocities and, therefore, to take steps to end them.

¶¶ 21–23. First on foot, then by bus, and finally in a National Police patrol car driven by a uniformed National Policeman, her abductors took her to a warehouse-like detention center where, after being temporarily blindfolded, she was locked alone in an unlit room for hours. *Id.* at ¶¶ 26–33. During the period of captivity that followed, Ortiz was subjected to horrific treatment. Her captors,[5] while interrogating her, burned her with cigarettes each time she responded, no matter what the answer; she protested that she was a North American citizen to no avail; they showed her photos of herself taken without her knowledge at various places and times throughout her stay in Guatemala, as well as photos of other indigenous people they claimed were subversives, all the while continuing to burn her with cigarettes as they questioned her about the pictures;[6] they blindfolded her again and hit her in the face so hard she was knocked to the floor; sitting her up, they stripped her and sexually abused her, raping her repeatedly until she began to black out intermittently. *Id.* at ¶¶ 34–45.

Later she awoke to find herself in a different room bound by the wrists to something above her; she was again interrogated, again raped, then lowered into a foul-smelling pit that seemed to be filled with bodies and crawling with rats; passing out again, she awoke only to be held down on the ground and raped yet again. *Id.* at ¶¶ 46, 47. At this point, a man she believed to be an American came in, cursed her tormentors and told them to leave her alone because she was North American and word of her abduction had been given wide coverage on the news. He then took her outside and, asking her forgiveness for this "mistake" that he said they had tried to prevent with the threatening letters, put her in a car and told her he would take her to a "friend in the U.S. Embassy" who could help her leave the coun-

try. *Id.* at ¶¶ 47–54. As they drove, however, she recognized that she was in the capital city and jumped out while the car was stopped in traffic; 48 hours later she was out of Guatemala. *Id.* at ¶ 54, ¶ 58.[7]

## 2. The Defendant's Responsibility

The defendant Gramajo, as Guatemala's Minister of Defense from 1987 until 1990, occupied the highest post in the Guatemalan military throughout Ortiz's ordeals. (Nairn Aff. ¶ 37, Ortiz Ex. G.) In this position, "Gramajo exercised authority and control over all subdivisions of the army and security forces," including "the National Police and detective units . . . as well as G–2, the intelligence section of the Army General Staff." *Id.* As Nairn explains:

> G–2, which reported directly to Gramajo (its officers meeting and conferring with him on a daily, sometimes hourly, basis), and operated, as he put it, under "strict control," centrally coordinated the surveillance, abduction and murder of Guatemalan and foreign civilians. . . . These operations would be carried out by the G–2's own officers and agents, or, under its guidance and Gramajo's command, by members and units of the rest of the Guatemalan army and the various security forces.

*Id.* According to Gramajo, G–2 followed " 'all those who are in opposition to the state within a very broad range'—'Guatemalans as well as foreigners'—with special emphasis on 'the behavior and attitude that have been displayed by persons who have been classified as 'opponents of the state.' " *Id.* ¶ 38. Gramajo included people active in the Catholic church, such as Ortiz, in his expansive definition of "opponents of the state." *See id.* ¶ 39. Despite numerous reports of disappearances and torture linked to G–2 and Gramajo, defendant took no action to stop

---

5. These included both the men who had abducted her and a man in the National Police uniform. *Id.*

6. Ortiz asserts that the photos of her are evidence of the "widespread surveillance to which [she] was subjected [which] could only have been undertaken by the Guatemalan military and security forces, under Defendant Gramajo's author-

ity[, inasmuch as these forces] (including the National Police) are the only institutions in Guatemala with the capacity to have conducted such nation-wide surveillance." (Ortiz Brief at 8 (citing Aff. of Allen Nairn, Ex. G, ¶¶ 37–38, 46).)

7. A doctor examining Ortiz after her return to this country found over 100 cigarette burns on her body. (Ortiz Compl. ¶ 26.)

such brutality; choosing instead to disparage the victims. *Id.* at ¶ 40–¶ 45. This pattern is entirely consistent with the horrific treatment Ortiz received at the hands of forces under Gramajo's direct supervision. *Id.* at ¶ 46.

As noted in Part II.A.2, above, Gramajo bears command responsibility for the brutality visited upon Ortiz. He compounded that responsibility with a gratuitous act of personal cruelty designed to divert attention from Ortiz's ordeal. Shortly after Ortiz fled Guatemala, Gramajo publicly stated that she had staged her own abduction and torture to cover up her involvement in a "love affair" and that her physical injuries did not actually exist. *Id.* at ¶ 49. These statements were widely publicized in both Guatemala and the United States in national newspapers and on television. (Ortiz Complaint ¶ 27–¶ 31.)

## III. DISCUSSION

An extended discussion is necessary to analyze fully the jurisdiction of this Court to provide a remedy for acts of a foreign government official outside this country.

### A. *Foreign Sovereign Immunities Act*

Under the Foreign Sovereign Immunities Act (FSIA)[8] "a federal court lacks subject matter jurisdiction over a claim against a foreign state," unless certain exceptions not relevant here apply, *Saudia Arabia v. Nelson,* —— U.S. ——, ——, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993). Thus, as a preliminary jurisdictional matter, I must determine whether the FSIA is triggered by either of the two actions now before me. Because by its terms, the FSIA operates to immunize only a "foreign state" from the exercise of this court's jurisdiction, I turn to a discussion of that term.

■ Section 1603 of the FSIA defines a "foreign state" to include the state's political subdivisions and its "agenc[ies] and instru-

mentalit[ies]."[9] The literal language of the statute thus seems to exclude natural persons from the scope of its grant of immunity. *See, e.g., Republic of Philippines v. Marcos,* 665 F.Supp. 793, 797 (N.D.Cal.1987) (terminology of statute makes clear not intended to apply to natural persons). Nevertheless, the Ninth Circuit has held that immunity under the FSIA extends to an individual official of a foreign state acting in his official capacity. *See Trajano v. Marcos, In re Estate of Marcos, Human Rights Litigation,* 978 F.2d 493, 497–98 (9th Cir.1992) (*"Marcos Estate I"*), *cert. denied,* —— U.S. ——, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993); *Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1099–1103 (9th Cir.1990). The Ninth Circuit has also held, however, that an individual official of a foreign state is *not* entitled to immunity under the FSIA in an action brought against him for acts beyond the scope of his authority. *See Marcos Estate I,* 978 F.2d at 497; *Chuidian,* 912 F.2d at 1106. As the Ninth Circuit recently observed, "[a] lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts." *Hilao v. Marcos, In re Estate of Marcos, Human Rights Litigation,* 25 F.3d 1467, 1472 (9th Cir.1994) (*"Marcos Estate II"*), *cert. denied,* —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995).

The First Circuit has not yet addressed the specific question whether, in the context of the FSIA, a "foreign state" should be defined to encompass an individual acting in his or her official capacity. Without deciding whether the scope of FSIA immunity should be thus extended, I conclude, as has the Ninth Circuit, that such immunity would in any event be unavailable in suits against an official arising from acts that were beyond the scope of the official's authority.

■ Upon review of the evidence adduced in support of default judgment, I find that

---

8. 28 U.S.C. § 1330, §§ 1602–11.

9. An "agency or instrumentality" is further defined to include "any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose

shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a [corporate] citizen of a State of the United States ... nor created under the laws of any third country." 28 U.S.C. § 1603 (paragraph structure omitted).

the acts which form the basis of these actions exceed anything that might be considered to have been lawfully within the scope of Gramajo's official authority.[10] Accordingly, I conclude that the defendant is not entitled to immunity under the FSIA, even if that statute were construed to apply to individuals acting in their official capacity. *Cf. DeLeletelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C.1980) (assassination is "clearly contrary to the precepts of humanity as recognized in both national and international law" and so cannot be part of official's "discretionary" authority), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985).

**B.** *Independent Federal Subject Matter Jurisdiction in Ortiz v. Gramajo, Civil Action No. 91–11612*

**1. Torture Victim Protection Act of 1991**

■ Plaintiff Ortiz, a U.S. citizen, brings this action in part under the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102–256, 106 Stat. 73, enacted on March 12, 1992.[11] The statute provides in relevant part:

10. There is no suggestion that either the past or present governments of Guatemala characterizes the actions alleged here as "officially" authorized.

11. Ortiz also alleges jurisdiction under 1) 28 U.S.C. § 1331 under the theory that gross violations of international human rights law "arise under" federal common law, and 2) 28 U.S.C. § 1332(a)(2)'s diversity jurisdiction over claims between a U.S. citizen and a citizen of a foreign state.

12. The statute defines torture to include:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind....

TVPA, § 3(b)(1).

An individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture shall, in a civil action, be liable for damages to that individual.

TVPA, § 2(a)(1). The statute unambiguously provides victims of torture with a private cause of action against the perpetrators of such abuse.[12] As a *prima facie* matter, therefore, Ortiz properly invokes the statute in this litigation: the defendant plainly acted under color of law, and there can be no doubt that Ortiz was subjected to torture. However, because the events of which she complains predate the enactment of the TVPA, I must first address the question whether that statute may be applied retroactively to her claims.

**2. Retroactivity**

The provisions of the TVPA statute itself do not speak to the question of retroactivity; nor does the statute's legislative history shed light on the matter.

Last term, in *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court re-

The TVPA's definition of torture parallels the definition found in the international Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"). *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, *opened for signature*, Feb. 4, 1985, 23 I.L.M. 1027 (1984), *modified*, 24 I.L.M. 535 (1985), Senate Treaty Doc. 100–20. The United States Senate consented, with reservations, to the ratification of the Convention Against Torture in 1990, *see* 136 Cong.Rec. S10091, S10093 (July 19, 1990) (Text of Resolution of Ratification). The United States also enacted 18 U.S.C. § 2340A, which makes torture or attempted torture a federal offense, in 1994, (to take effect *the later of* April 30, 1994 or the date on which the United States becomes a party to the Convention Against Torture, *see* Pub.L. No. 103–236, 108 Stat. 463, 464). The instrument of ratification for the Convention Against Torture was deposited with the United Nations on October 21, 1994. *See* Depositary Notification, Ratification by the United States of America, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, United Nations, Reference C.N.382.1994.Treaties–6, (Feb. 27, 1995). Pursuant to Article 27 of the Convention Against Torture, the Convention entered into force for the United States on November 20, 1994, thirty

emphasized the importance of a general presumption against retroactivity. There, the Court held that provisions of the Civil Rights Act of 1991 allowing recovery of compensatory and punitive damages, and authorizing a jury trial on such damages, did not apply to a case pending on appeal when the statute was enacted. The Court explained:

> the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal."

—— U.S. at ——, 114 S.Ct. at 1497 (citation and footnotes omitted). The Court noted, however:

> We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed....
>
> Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties."

—— U.S. at —— – ——, 114 S.Ct. at 1501–02 (citations omitted). Similarly, applying the TVPA retroactively allows Ortiz to bring suit in federal court rather than in a municipal court. It does not automatically change the rights or obligations of the parties.

In this case, it is theoretically possible to tease out the legal argument that had the defendant only known of his incipient liability under the TVPA, he would have refrained from engaging in torture. To indulge the illusion that an actor will first review his or her potential liability under all extant law before taking action is more than just an empty legal fiction employed for disciplined resolution of these matters—it is an expression of a fundamental desire to ensure that the law in all cases be fairly applied. Nonetheless, I do not believe that the acceptance of such a fiction here would further that interest.

The universal condemnation of the use of torture was fully established prior to the events on which the instant claims turn. *See, e.g., Filartiga v. Pena–Irala,* 630 F.2d 876, 883–85 (2nd Cir.1980) (finding right to be free from torture vis-a-vis one's own government a fundamental principle under international law); Universal Declaration of Human Rights, *adopted* Dec. 10, 1948, art. 5, U.N. Doc. A/811 ("No one shall be subjected to torture ..."). It cannot be suggested credibly that Gramajo "believed" his actions fell within some prevailing legal norm.[13] Thus, the Supreme Court's observation in *Landgraf,* that "[i]n a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions," —— U.S. at ——, 114 S.Ct. at 1497, is plainly inapplicable to the present case.

For similar reasons, I find that the public's interest in seeing that the TVPA is available to a plaintiff such as Ortiz who has suffered deliberately brutal abuse far outweighs any disappointment there might be of Gramajo's private expectations. There being thus neither compromise of substantive rights nor consequent manifest injustice, I conclude that retroactive application of the TVPA as the law in effect at the time of decision is entirely proper in this case.[14]

days after the deposit of the instrument of ratification.

**13.** It slices the issues too thinly to contend that, even conceding the universal prohibition against torture, Gramajo justifiably "believed" he would not be subject to liability in this case in a United States court absent a statute like the TVPA. Substantive rights should not be confused with the vehicles for their enforcement.

**14.** As further support for this resolution, I note that the Senate Committee Report accompanying the TVPA, citing *Filartiga,* observes that the statute would extend to U.S. citizens as well as aliens "an unambiguous basis for a cause of action that has been successfully maintained under an existing law [i.e., 28 U.S.C. § 1350]." S.Rep. No. 249, 102d Cong., 1st Sess. 4 (1991).

Given retroactive application of the TVPA, federal statutory law clearly creates the cause of action upon which plaintiff Ortiz's lawsuit is founded. The case thus "arises under" the laws of the United States for purposes of federal question jurisdiction under 28 U.S.C. § 1331. *See, e.g., Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986) (quoting *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 8–9, 103 S.Ct. 2841, 2845–46, 77 L.Ed.2d 420 (1983)). This Court therefore has subject matter jurisdiction to hear plaintiff Ortiz's TVPA claims.

### 3. Plaintiff Ortiz's Claim under TVPA

■ In order to be entitled to recover damages under the Torture Victim Protection Act, plaintiff Ortiz must show that she was subjected to torture by the defendant under "actual or apparent authority, or color of law, of any foreign nation" and that she has "exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." TVPA, § 2(a), (b).

Taking the factual allegations described earlier as admitted by virtue of the defendant's default, I find them more than sufficient to establish that Gramajo did under color of law (by his order and command) subject Ortiz to torture as defined in § 3(a) of the Torture Victim Protection Act.[15] I find also that Ortiz has exhausted the remedies that were available to her "in the place

in which the conduct giving rise to [her] claim occurred," i.e., Guatemala. The plaintiff states in her affidavit that she returned to Guatemala in April of 1992 (approximately two and a half years subsequent to her abduction) to provide testimony in the courts of Guatemala. (*See* Ortiz Decl. ¶ 65.) The plaintiff provided over twelve hours of in-court testimony, during which she was asked to recount the details of her ordeal. At last report, this criminal case had made no progress for several years; and, under Guatemalan law, a civil action cannot be brought until final judgment has been rendered in the criminal proceedings.[16]

■ The legislative history to the TVPA indicates that the exhaustion requirement of § 2(b) was not intended to create a prohibitively stringent condition precedent to recovery under the statute. Rather, the requirement must be read against the background of existing judicial doctrines under which exhaustion of remedies in a foreign forum is generally not required "when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile." S.Rep. No. 249, 102d Cong., 1st Sess. 10 (1991). I find that Ortiz has exhausted the remedies available to her in Guatemala for purposes of the TVPA.

### C. Independent Federal Subject Matter Jurisdiction under 28 U.S.C. § 1350 in *Xuncax et al. v. Gramajo,* Civil Action No. 91–11564

■ The *Xuncax* plaintiffs, unlike plaintiff Ortiz, do not expressly assert a claim in their

---

To the extent, then, that the TVPA may be viewed as closing a perceived "jurisdictional gap," retroactive application is also appropriate. *See Demars v. First Service Bank for Savings,* 907 F.2d 1237, 1240 n. 5 (1st Cir.1990) (citing *Dedham Water Co. v. Cumberland Farms Dairy Inc.,* 805 F.2d 1074, 1084 (1st Cir.1986) (proper to apply *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), presumption favoring retroactivity at least where Congress expands courts' jurisdiction in response to a "perceived gap in a statutory jurisdictional scheme")).

**15.** The statute defines torture in part as an "act[ ] directed against an individual in the offender's *custody or physical control....*" TVPA, § 3(b)(1) (emphasis added). There is some potential for ambiguity in the phrase "custody or physical

control," but I resolve the ambiguity in favor of the plaintiff in this case. While it may be argued that Ortiz was never in Gramajo's personal custody or physical control, the legislative history of the TVPA indicates that this circumstance does not preclude his liability for her ordeal. As the Senate Committee Report accompanying the statute explains, "a higher official need not have personally performed or ordered the abuses in order to be held liable [under the TVPA]." S.Rep. No. 249, 102d Cong., 1st Sess. 9 (1991). I find that Ortiz was in the defendant's "custody" for purposes of TVPA liability, given that the defendant had authority and discretion to order that Ortiz be released.

**16.** *See* Ortiz' Supp. Mem. at 50 (citing Declaration of S. Shawn Roberts, Ex. J to Ortiz Mot. for Default Judgment).

Complaint under the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. 102–256, 106 Stat. 73, which was passed slightly more than a month after they filed their Brief in Support of Motion for Default Judgment. Rather, they contend that this Court has subject matter jurisdiction to entertain their claims by virtue of the Alien Tort Claims Act, 28 U.S.C. § 1350. That statute provides that a federal district court "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or treaty of the United States." 28 U.S.C. § 1350.

### 1. The Scope of § 1350

Judicial opinions that have had occasion to impart meaning to § 1350 have not reached a consensus regarding the statute's import. A majority of courts, interpreting the statute broadly, have held that if an alien plaintiff can establish that the abuses allegedly inflicted upon her constitute violations of international law, § 1350 grants *both* a federal private cause of action as well as a federal forum in which to assert the claim. *See, e.g., Marcos Estate II,* 25 F.3d at 1475 (9th Cir. 1994) (§ 1350 "creates a cause of action for violations of specific, universal and obligatory human rights standards,"); *Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 424–25 (2d Cir.1987), *rev'd on other grounds,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) *Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980); *Paul v. Avril,* 812 F.Supp. 207, 212 (S.D.Fla.1993); *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1539 (N.D.Cal.1987), *on reconsideration on other grounds,* 694 F.Supp. 707 (N.D.Cal. 1988). The Ninth Circuit has concluded that § 1350 plaintiffs may look to municipal law as a source of substantive law. *See Marcos Estate I,* 978 F.2d at 503 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993). *See also Marcos Estate II,* 25 F.3d at 1476 n. 10. Judges of the

District of Columbia Circuit, meanwhile, via separate concurrences, have at length and in a considered fashion propounded alternative views. *See Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984); *id.* at 798 *et seq.* (Bork, J., concurring) (independent cause of action must be created by federal statute or international law itself, § 1350 inadequate to do so), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), *id.* at 775, *et seq.*; (Edwards, J., concurring) (suggesting domestic tort law may provide substantive cause of action under § 1350). After extended reflection, I find that § 1350 yields both a jurisdictional grant and a private right to sue for tortious violations of international law (or a treaty of the United States), without recourse to other law as a source of the cause of action.

### a. The *Filartiga* Approach

In *Filartiga,* the wellspring of modern § 1350 case law,[17] the Second Circuit first determined that the acts of torture there at issue violated international law. *Id.* at 882–84.[18] The court then concluded that international law forms an integral part of the common law of the United States and that, accordingly, "[f]ederal jurisdiction over cases involving international law is clear." *Id.* at 887. In reaching this point, the *Filartiga* court flatly rejected the argument that, under the Constitution's grant of power to Congress to "define and punish ... offenses against the law of nations," Art. I, sec. 8, cl. 10, international law fell within federal common law "only to the extent that Congress has acted to define it," citing "numerous decisions applying rules of international law uncodified in any act of Congress." *Id.* at 886 (citations omitted). The court similarly rejected the notion that § 1350 itself was but a grant by Congress to the federal judiciary to define what constitutes a violation of international law. Adjuring that courts "are not to prejudge the scope of the issues that the

---

**17.** Prior to *Filartiga,* § 1350 was rarely used as a jurisdictional basis, let alone as a cause of action. *See, e.g., Adra v. Clift,* 195 F.Supp. 857 (D.Md. 1961) (falsified passport supplied international law violation yielding jurisdiction under § 1350 in child custody suit between aliens); *Bolchos v. Darrell,* 3 Fed.Cas. 810 (D.S.C.1795) (§ 1350 as alternative jurisdictional basis in suit to establish

title to slaves captured on high seas from enemy vessel).

**18.** In so finding, the *Filartiga* court observed that international law is not static, but is an evolving body of directives which courts must interpret in a contemporaneous fashion. 630 F.2d at 881.

nations of the world may deem important to their interrelationships," the court stated that

[i]t is only where the nations of the world have demonstrated that the wrong is of mutual, not merely several, concern, by means of express international accords, that a wrong becomes an international violation within the meaning of the statute.

*Id.* at 888.[19] This understanding of the function of § 1350 comports with my own reading of the statute.

By contrast, in his concurrence in *Tel–Oren*, Judge Bork contended that the terms of § 1350 do not grant plaintiffs an explicit cause of action, and that a plaintiff who seeks to invoke a court's subject matter jurisdiction under § 1350 must show that international law or a United States treaty (upon the basis of which the plaintiff invokes § 1350) provides a right to sue. *See Tel–Oren*, 726 F.2d at 810–16 (Bork, J., concurring). Judge Bork's view is notably more restrictive than the plain language of § 1350 permits. As Judge Edwards observed in his *Tel–Oren* concurrence, Judge Bork's interpretation might be compelling if the statute required that a plaintiff's claims "arise under" the law of nations or a treaty of the United States. *See Tel–Oren*, 726 F.2d at 779 (Edwards, J., concurring). But the statute contains no such language. All that the statute requires is that an alien plaintiff allege that a "tort" was committed "in violation" of international law or a treaty of the United States. Thus, in enacting § 1350, Congress has exercised its Article III power to allow aliens to seek civil redress in federal court for wrongs committed in violation of international law or United States treaties. As expressed by the district court upon remand in *Filartiga v. Pena–Irala,*

[t]he international law prohibiting torture established the standard and referred to the national states the task of enforcing it. By enacting Section 1350, Congress entrusted that task to the federal courts and gave them power to choose and develop federal remedies to effectuate the purposes of the international law incorporated into the United States common law.

577 F.Supp. 860, 863 (E.D.N.Y.1984).[20]

To posit—and then reject—international law as a putative source for the legal mechanics of a cause of action is to misconstrue the basic nature of international law. While it is demonstrably possible for nations to reach some consensus on a binding set of principles, it is both unnecessary and implausible to suppose that, with their multiplicity of legal systems, these diverse nations should also be expected or required to reach consensus on the types of actions that should be made available in their respective courts to implement those principles. Thus, while nations may agree in some instances on a given approach, *see, e.g., Tel–Oren*, 726 F.2d at 778 (Edwards, J. concurring) (noting United Nations Genocide Convention committing states to make genocide a crime), in general, international law leaves it to the various states to devise the remedies they think appropriate. *See, e.g., Restatement (Third) of Foreign Relations Law* § 703 cmt. c.[21] To read

19. More specifically, the court cited "the usage of nations, judicial opinions and the works of jurists" as "the sources from which customary international law is derived." 630 F.2d at 884.

20. In a related objection, Judge Bork, finding that international law itself does not expressly grant a right to sue, considered it violative of separation of powers concerns for courts to *imply* one. *See Tel–Oren*, 726 F.2d at 801–05 (Bork, J., concurring). Notwithstanding his further observation that "international legal principles … are anything but clearly defined and … are the subject of controversy touching 'sharply on national nerves,'" *id.* at 805 (Supreme Court citation omitted), I find the objection off the mark. If there are certain fundamental principles established with sufficient clarity by international law as to be made actionable, as I find there are, § 1350 represents a Congressional determination to override conflicting policies expressly and not by implication. Because courts adjudicating under § 1350 are confined to redressing tortious violations only of established norms of international law, they are not free simply to "imply" causes of action under international law as they see fit.

21. This is not to suggest that a nation which would count itself a member of the international community has no duty to redress international law violations. *See The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900) ("[i]nternational law is part of our law, and must be ascertained and administered by the courts of … appropriate jurisdiction, as often as questions of right depending upon it are duly

§ 1350's reference to "the law of nations" as requiring international agreement on the type of action available, therefore, "would be to effectively nullify [that] portion of [the statute]", *Tel–Oren,* 726 F.2d at 778 (Edwards, J. concurring), a result violative of customary rules of statutory construction. *See also Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1539 (N.D.Cal.1987) (*Forti I*), *on reconsideration on other grounds,* 694 F.Supp. 707 (N.D.Cal.1988) (*Forti II*).

■ Judge Bork raised a separate objection to *Filartiga*'s reading of § 1350: In his view, due to the parallel construction given "law of nations" and "treaties of the United States" in the statute, the *Filartiga* interpretation would effectively make all U.S. treaties self-executing. *See Tel–Oren,* 726 F.2d at 811–12, 820 (Bork, J., concurring). Again, I question the focus of this concern; it is only those treaty provisions that would actually give rise to a "tort" action by reason of their violation which are implicated. In this, Judge Bork's objection appears mistakenly to conflate two propositions: (1) plaintiffs may bring actions under § 1350 based upon the violation of a U.S. treaty, and (2) plaintiffs may bring actions under § 1350 *for torts* committed in violation of a U.S. treaty. The two propositions are different; the latter is the operative one under § 1350 and in this context is considerably more restrictive than the former. In any event, Congress, as both the author of § 1350 and the ratifier of any treaty potentially actionable thereunder, is fully capable of repairing any perceived faults in this schema. Thus far, in enacting the TVPA, Congress has expressed its approval of the *Filartiga* line of cases by extending to U.S. citizens as well as aliens "an unambiguous basis for a cause of action that has been successfully maintained under [§ 1350]." S.Rep. No. 249, 102d Cong., 1st Sess. 4 (1991). As the Senate Committee explained, "claims based on torture or summary executions [made actionable by the TVPA] do not exhaust the list of actions that may appropriately be covered by section 1350. Consequently that statute should re-

main intact." *Id.* at 5 (footnote omitted). *See also* H.Rep. No. 367, 102d Cong., 1st Sess. 4, 5 (1991).

**b. The Domestic Law Alternative Approach**

■ In endorsing the *Filartiga* approach to § 1350, Judge Edwards worried that it would leave courts with the "awesome duty ... to derive from an amorphous entity—*i.e.,* the 'law of nations'—standards of liability applicable in concrete situations." *Tel–Oren,* 726 F.2d at 781 (Edwards, J., concurring). In view of this prospect, he framed an "alternative" approach which he thought might provide more effective guidance. Under this alternative approach, § 1350 would allow an alien plaintiff to bring a *municipal tort* claim in federal court, provided that the plaintiff could show (as a threshold matter) that the tort was committed in violation of a treaty of the United States or the law of nations. In other words, so long as an alien plaintiff can assert some private cause of action sounding in tort and grounded upon a violation of international law or a treaty of the United States, the federal district courts have jurisdiction under § 1350 to hear the plaintiff's claims. The substantive rule of decision in a case maintained under § 1350 is then provided by the municipal tort law under which the plaintiffs bring their claims. As Judge Edwards summarized,

> section 1350 may be read to enable an alien to bring a common law tort action in federal court without worrying about jurisdictional amount or diversity, as long as a violation of international law is also alleged.... [T]he substantive right on which this action is based must be found in the domestic tort law of the United States.

*Id.* at 782.

As noted, the Ninth Circuit, in *Marcos Estate I,* 978 F.2d at 503, affirmed a district court's use of this approach (with the apparent modification that the domestic law of the *foreign* jurisdiction [the Philippines] provided

---

presented for their determination"). *See also* Louis Henkin, *International Law as Law in the United States,* 82 Mich.L.Rev. 1555, 1569 (1984) (courts should "give effect to the developments in

international law to which the United States is a party, unless Congress is moved to reject them as domestic law in the United States").

the cause of action—presumably based on choice-of-law reasoning). The Ninth Circuit explained:

> The district court's approach also allows the "law of nations" and "treaty" prongs of § 1350 to be treated consistently, in that the cause of action comes from municipal tort law and not from the law of nations or treaties of the United States. This avoids the anomalous result which troubled Judge Bork in *Tel–Oren*, that whereas *Filartiga* found a private right of action by implying it from principles of international law, no private cause of action can ever be implied from a nonself-executing treaty.

*Marcos Estate I,* 978 F.2d at 503 (citation omitted). The perceived value of this approach is that, after concluding the threshold inquiry into whether a violation of international law is alleged, a district court could simply apply the relatively definite and concrete standards of liability as set out in the municipal tort law. I find this elaborate approach to be neither consistent with the terms of § 1350 nor with its manifest intent.[22]

First, the *Filartiga* approach to § 1350—that a violation of those several norms recognized by international law provides both federal jurisdiction and a cause of action for aliens—appears to comport with the "plain meaning" of the statute. *See Filartiga,* 577 F.Supp. at 862–64 (on remand) ("tort" under § 1350 means wrong "in violation of the law of nations", not merely "wrong actionable under the law of the appropriate sovereign state").

Second, leaving the remedy to be fashioned by federal courts, referring to the full range of appropriate legal materials, is both in line with the weight of precedent and would appear to have been legitimated by Congress through the passage of the TVPA.

Third, as daunting a task as it may be to fashion a remedy from the "amorphous body" of international law, it is hardly out of scale with similar challenges federal courts have successfully addressed in the past. *See, e.g., Textile Workers of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (jurisdictional statute permitting judicial explication of federal common law).

Fourth, by not tethering § 1350 to causes of action and remedies previously developed under roughly analogous municipal law, the federal courts will be better able to develop a uniform federal common law response to international law violations, a result consistent with the statute's intent in conferring federal court jurisdiction over such actions in the first place. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 940 n. 25, 11 L.Ed.2d 804 (1964) (citing § 1350 as a statute "reflecting a concern for *uniformity* in the country's dealings with foreign nations and indicating a desire to give matters of international significance to the jurisdiction of federal institutions") (emphasis added).[23]

Fifth, when developing an appropriate response to violations of international law, courts will be freer to incorporate the full range of diverse elements that should be drawn upon to resolve international legal issues than they would if bound to a straightforward recurrence to extant domestic law. Thus, while the substantive principles giving rise to the cause of action are properly and ultimately grounded in international law, the federal courts would, for example, be less constrained from looking to the municipal

---

**22.** I note, however, that I would reach substantially the same result here if I were to apply Massachusetts tort law, such as the Wrongful Death Act, Mass.Gen.L. ch. 229, § 1, or Guatemalan law (*see* Affidavit of Alejandro M. Garro, Xuncax Mot. Default Ex. O, Ortiz Ex. L, Xuncax Supp. Mem. Ex. B). *See* Part IV.C.1, *infra.* The only differences would be that Pedro–Pascual would not have standing to bring an action on behalf of her deceased sister under Massachusetts law, *see* Part III.C.2.b, *infra,* Callejas would not recover for the "disappearance" of his father because he does not make such a claim under municipal law, and punitive damages might not

be appropriate under Guatemalan law, *see* Part IV.C.2, *infra.*

**23.** *See also The Federalist* No. 3 (John Jay): "Under the national government, treaties, . . . as well as the laws of nations, will always be expounded in one sense and executed in the same manner, whereas adjudications on the same points and questions in the thirteen states will not always accord or be consistent." This same problem could arise where federal courts look to the local forum as the source of applicable municipal law.

law of other interested countries for guidance, so long as such law is not inconsonant with international or domestic (U.S.) law.

Finally, reading § 1350 as essentially a jurisdictional grant only and then looking to domestic tort law to provide the cause of action mutes the grave *international law* aspect of the tort, reducing it to no more (or less) than a garden-variety municipal tort. This is not merely a question of formalism or even of the amount or type of damages available; rather it concerns the proper characterization of the *kind* of wrongs meant to be addressed under § 1350: those perpetrated by *hostis humani generis* ("enemies of all humankind") in contravention of *jus cogens* (peremptory norms of international law). In this light, municipal tort law is an inadequate placeholder for such values.[24]

In sum, while it may be an "awesome duty" to develop the liability standards applicable to international law violations through the generation of federal common law, I do not see how reading § 1350 as mandating recurrence to municipal tort law would provide an appropriate response to the challenge. Given the seeming inadequacy of municipal law to address, meaningfully, such human rights violations as are at issue here—i.e., torture, summary execution, disappearances—there appears little warrant to look to municipal law exclusively for guidance in redressing these violations.

Moreover, the domestic law approach magnifies a problem implicit in a case like *Adra v. Clift*, 195 F.Supp. 857 (D.Md.1961). There, the municipal tort alleged was the taking of a minor child from the parent with lawful custody, while the "international law violation" providing the jurisdictional hook was an alleged falsification of passport. Setting aside the important question whether passport misuse actually rises to the standards which define a "violation of international law," a case like *Adra* begs the question of how closely allied the alleged violations of international and municipal law must be. Could they be wholly unrelated, different in kind as well as degree?

Similarly, there is the concern raised by a case like *Marcos Estate I*, where the court sought to apply the municipal law of a foreign state. While I have noted the desirability of leaving courts *free* to draw upon diverse sources of law where appropriate, novel concerns arise when United States courts are *obliged* to discern, interpret, and then enforce standards of liability framed by foreign courts or legislative bodies, simply because the underlying cause of action may (or may not) be coincident with or analogous to an alleged violation of international law. Who would determine which municipal law is to be sued "under"? The plaintiff? Or would it be up to the court to determine, through choice-of-law principles, which domestic law was properly invoked? If the latter, is this not a further troublesome conflation of jurisdictional and substantive concerns? If the former, would the plaintiff's choice be for jurisdictional purposes only, or would it also somehow guide the choice-of-law, in which case, would there not be problems of "domestic law shopping"?

### c. Conclusion

The *Filartiga* approach addresses the purposes of the Congressional mandate, while "alternative" approaches present complex challenges of their own with no convincing rationale favoring their adoption. Accordingly, I conclude that, given a successful showing that harms were committed upon them in violation of international law or a treaty of the United States, the *Xuncax* plaintiffs properly assert jurisdiction in this Court and state a cause of action under § 1350 without recourse to other law.[25]

---

**24.** For example, I question the appropriateness of using a municipal wrongful death statute to address summary executions or "disappearances." Similarly, I doubt any municipal law is available to address the crime of genocide adequately.

**25.** It is appropriate to note briefly at this point the legitimacy of United States jurisdiction over such violations from the perspective of international law. Accordingly, I take explicit note here of the doctrine of universal jurisdiction, as set forth in Section 404 of the *Restatement (Third) of Foreign Relations Law*, which provides that a "state may exercise jurisdiction to define and punish certain offenses recognized by the community of nations as of universal concern...." *See, e.g.,* S.Rep. No. 249, 102d Cong., 1st Sess. 5 (1991) (citing same in rationalizing passage of TVPA).

I now turn to the question whether the plaintiffs in this case have shown a violation of international law sufficient to support jurisdiction under § 1350.

### 2. Xuncax Plaintiffs' Claims of Violations of International Law

#### a. Peremptory Norms of International Law

As the Ninth Circuit has noted, "for a court to determine whether a plaintiff has a claim for a tort committed in violation of international law, it must [first] decide whether there is an applicable norm of international law ... and [then] whether it was violated in the particular case." *Marcos Estate I*, 978 F.2d at 502. In reaching such a decision, courts are guided by "the usage of nations, judicial opinions and the works of jurists" as "the sources from which customary international law is derived." *Filartiga*, 630 F.2d at 884. For further guidance regarding the "norms" of international law, courts and international law scholars look to whether the standard can be said to be "universal, definable and obligatory." *Forti I*, 672 F.Supp. at 1540. These qualifications essentially require that 1) no state condone the act in question and there is a recognizable "universal" consensus of prohibition against it; 2) there are sufficient criteria to determine whether a given action amounts to the prohibited act and thus violates the norm; 3) the prohibition against it is nonderogable and therefore binding at all times

upon all actors. *See generally Forti I*, 672 F.Supp. at 1539–40; Aff. of Int'l Law Scholars, Ortiz Ex. M; *Restatement (Third) of Foreign Relations Law* §§ 701–02.

The *Xuncax* plaintiffs allege five violations of international law:

(1) *Summary execution:* Xuncax, for her husband's death, Doe, for his father's death, and Pedro–Pascual, for her sister's death; [26]

(2) *Disappearance:* Callejas, based on his father's disappearance;

(3) *Torture:* Xuncax, for her husband, Doe, for his father, and Diego–Francisco, for himself and his wife;

(4) *Arbitrary detention:* Xuncax, for her husband, Doe, for his father, and Diego–Francisco, for himself and his wife;

(5) *Cruel, inhuman and degrading treatment:* Xuncax, Diego–Francisco, Doe, Pedro–Pascual, Francisco–Marcos, Manuel–Mendez, the Ruiz–Gomez brothers, and Callejas;

I am satisfied that four of these claims—torture, summary execution, disappearance, and arbitrary detention—constitute fully recognized violations of international law. Numerous federal court decisions and an ever-growing number of international agreements and conventions have established beyond question that the use of official torture is strictly prohibited by the most fundamental principles of international law.[27] As the Sec-

---

In addition to this permissive basis for jurisdiction, I note that, at least as regards torture, there is an *obligation* incumbent upon individual nations to see that such violations of international law are redressed. *See, e.g.,* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 23 I.L.M. 1027 (1984) (at Article 14, providing that each participating member state "shall *ensure* in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation....") (emphasis supplied); 18 U.S.C. § 2340.

26. Each of the plaintiffs brings a claim on their own behalf, as well as on behalf of the respective next-of-kin. *See* Xuncax Preliminary Statement at 21–25. I will discuss their standing to bring claims for harm to a third person in Part III. C.2.b, below.

27. *See, e.g.,* European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Nov. 26, 1987, ch. 1, art. 1, 27 I.L.M. 1152, 1154 (setting up a committee to investigate alleged human rights abuses "with a view to strengthening, if necessary, the protection of ... persons from torture and from inhuman or degrading treatment or punishment"); American Convention on Human Rights, Nov. 22, 1969, art. 5, par. 2, 9 I.L.M. 673, 676 ("No one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment."); International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, 999 U.N.T.S. 171, 175 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); European Convention on the Protection of Human Rights and Fundamental Freedom, Nov. 4, 1950, art. 3, 213 U.N.T.S. 221, 224 ("No one shall be subjected to torture or to inhuman or degrading treatment or

ond Circuit declared in 1980, "the torturer has become—like the pirate and slave trader before him—*hostis humani generis,* an enemy of all mankind." *Filartiga,* 630 F.2d at 890. *See also Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir. 1992) (finding it unthinkable that official torture does not violate customary international law), *cert. denied,* —— U.S. ——, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). The prohibition against torture is thus universal and obligatory; what constitutes torture, moreover, has been more than adequately defined to embrace the instant allegations.[28]

As with official torture, the practices of summary execution, "disappearance," and arbitrary detention also have been met with universal condemnation and opprobrium. *See Forti II,* 694 F.Supp. at 711; Aff. of Int'l Law Scholars at 29–36. By international consensus, such practices have been adjudged to be inconsistent with the "inherent dignity and of the equal and inalienable rights of all members of the human family."

Universal Declaration of Human Rights, Preamble & arts. 9–11, *adopted* Dec. 10, 1948, G.A. Res. 217A, U.N. Doc. A/811. An affidavit signed by twenty-seven widely respected scholars of international law attests that every instrument or agreement that has attempted to define the scope of international human rights has "recognized a right to life coupled with a right to due process to protect that right." Aff. of Int'l Law Scholars, Ortiz Ex. M, at 40.[29] And again, not only are the proscriptions of these acts universal and obligatory, they are adequately defined to encompass the instant allegations. Consequently, this Court clearly has jurisdiction under § 1350 to hear the plaintiffs' claims for recovery in tort in connection with injuries suffered as a result of the acts of torture, summary execution, disappearance and arbitrary detention perpetrated or commanded by the defendant.[30]

The remaining category of claims, however—cruel, inhuman or degrading treat-

punishment."); Universal Declaration of Human Rights, *adopted* Dec. 10, 1948, art. 5, U.N. Doc. A/811 ("No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); *see also Restatement (Third) of Foreign Relations Law* § 702(d) ("A state violates international law if, as a matter of state policy, it practices, encourages, or condones ... torture or other cruel, inhuman, or degrading treatment or punishment.").

**28.** *See, e.g.,* Aff. of Int'l Law Scholars, Ortiz Ex. M at 26, citing *inter alia* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1, *adopted* Dec. 10, 1984, G.A.Res. 46, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force for the United States* November 20, 1994, *see* note 12, *supra.*

**29.** *See, e.g.,* Aff. of Int'l Law Scholars, Ortiz Ex. M, citing *inter alia* G.A.Res. 22, 36 U.N. GAOR Supp. (no. 51) at 168, U.N. Doc. A/36/51 (1981) (condemning "the practice of summary executions and arbitrary detentions"); *Forti I,* 672 F.Supp. at 1542 ("proscription of summary execution or murder by the state appears to be universal, is readily definable, and is of course obligatory"); G.A.Res. 173, 33 U.N. GAOR Supp. (No. 45) at 158, U.N. Doc. A/33/45 (1979) (disappearance violates Universal Declaration of Human Rights, G.A.Res. 217A (III)); International Covenant on Civil and Political Rights, art. 4, *adopted* Dec. 16, 1966, *entered into force* Mar. 23, 1976, G.A.Res. 2200, 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (derogation from

right to be free of arbitrary detention permitted only in time of public emergency imperiling life of nation, the which is officially proclaimed); *De Sanchez v. Banco Central De Nicaragua,* 770 F.2d 1385, 1397 (5th Cir.1985) ("[T]he standards of human rights that have been generally accepted—and hence incorporated into the law of nations— ... encompass ... such basic rights as the right not to be murdered, tortured ... and the right not to be arbitrarily detained."); *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1388 (10th Cir.1981) ("[n]o principle of international law is more fundamental than the concept that human beings should be free from arbitrary imprisonment").

**30.** On reconsideration in *Forti II,* the court explained:

"The international community has also reached a consensus on the definition of a 'disappearance.' It has two essential elements: (a) abduction by a state official or by persons acting under state approval or authority; and (b) refusal by the state to acknowledge the abduction and detention."

694 F.Supp. at 710 (citations omitted).

The legal scholars in this case offer the same definition of "disappearance." (Aff. of Legal Scholars at 35–36, Xuncax Mot. Default Ex. P.) Callejas alleges that the Guatemalan Army would not officially acknowledge the location where his father was held or buried, and that they threatened his life for making such enquiries. (Callejas Aff. at 4–5.) Thus, I deem the second element of "disappearance" satisfied.

ment—presents a closer question.[31] The international prohibition against such treatment appears to be no less universal than the proscriptions of official torture, summary execution, disappearance and arbitrary detention. Indeed, most of the major international human rights instruments conjoin in the same sentence the prohibitions against torture and against cruel, inhuman, or degrading treatment.[32] Thus, the international legal scholars assert that the major international agreements on human rights generally treat the norm proscribing cruel, inhuman, or degrading treatment in parity with the prohibition against official torture. (*See* Aff. of Int'l Law Scholars at 28–29.)

Notwithstanding universal acceptance of the norm in the abstract sense, however, it is evident that the prohibition against such treatment poses more complex problems of definition than are presented by the norms forbidding torture, summary execution, disappearance or arbitrary detention. Indeed, such definitional problems led the district court in *Forti II* to dismiss a claim for cruel, inhuman or degrading treatment as a violation of international law. Observing that "[t]o be actionable under the Alien Tort Statute the proposed tort must be characterized by universal consensus in the international community as to its binding status *and its content*," the court concluded that the plaintiffs had "fail[ed] to establish anything approaching universal consensus as to what constitutes 'cruel, inhuman, or degrading

treatment'" and so dismissed that aspect of their claim. *Forti II*, 694 F.Supp. at 712.[33]

The plaintiffs argue here that since *Forti II* specific content has been given to the recognized principle by a Senate reservation to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR Supp. No. 51, U.N. Doc. A/Res/39/708, art. 14(2) (1984) (consented to by the U.S. Senate in October 1990) ("Convention Against Torture"), which states:

> That the United States considers itself bound by the obligation under Article 16 to prevent "cruel, inhuman or degrading treatment or punishment," only insofar as the term "cruel, inhuman or degrading treatment or punishment" means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States.

136 Cong.Rec. S10091, S10093 (July 19, 1990) (Text of Resolution of Ratification); *see also* 138 Cong.Rec. S4781, S4783 (identical reservation amended to Int'l Covenant on Civil and Political Rights ratified in September 1992). Plaintiffs assert that, in addition to recognizing the norm officially, the United States government by this reservation has also indicated "with the level of clarity and precision given to the U.S. constitutional amendments, how that international norm is to be interpreted under U.S. law." Supp.

31. With the exception of Manuel–Mendez and the Ruiz–Gomez brothers, any difficulties relating to the plaintiffs' claims of cruel, inhuman and degrading treatment are not directly material to the question of jurisdiction. The claims of torture, summary execution, disappearance and/or arbitrary detention made by the other plaintiffs support jurisdiction under § 1350.

32. *See, e.g., supra* note 27 (citing instances of prohibitions against torture joined by prohibitions against cruel, inhuman or degrading treatment).

33. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 23 I.L.M. 1027 (1984), to which the United States is a party, provides some indirect support for the *Forti* court's finding. Article 14 of the Convention provides that each participating member state "shall ensure in its legal sys-

tem that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation...." The Convention adopts a slightly less stringent approach, however, with respect to cruel, inhuman, or degrading treatment. Article 16 provides that each party to the Convention "shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture...." The decision not to mandate fair and adequate compensation or other direct redress for cruel, inhuman or degrading treatments may be traceable to a recognition that the norm against "cruel, inhuman or degrading treatment" is susceptible to special problems of definition and enforcement. In this regard, I note that while the Convention contains a detailed definition of "torture" (art. 1), it does not define "cruel, inhuman or degrading treatment."

Mem. in Support of Plaintiffs' Mot. for Default Judgment at 34.

■ Contrary to plaintiffs' characterization, however, this development does not directly aid their cause. A precept of "international law" cannot be recognized as such unless and until that recognition is universal. And the requirement of universality goes not only to recognition of the norm in the abstract sense, but to agreement upon its content as well. Far from affirming the international law status of the norm, the Senate reservation appears to cut precisely the other way: it explicitly ties the content of the abstract standard not to international customs and norms, but to Constitutional law, i.e. the organic domestic law of the United States.

The fact that the parameters of a norm otherwise recognized under international law are tied in this country to constitutional interpretation, however, does not compel the conclusion that no aspect of the norm can qualify as international law. Where American constitutional law and international law overlap, the voice of this country as part of the consensus rendering the proposition in question a rule of international law is simply embodied in domestic constitutional directives.

■ It is not necessary that every aspect of what might comprise a standard such as "cruel, inhuman or degrading treatment" be fully defined and universally agreed upon before a given action meriting the label is clearly proscribed under international law, any more than it is necessary to define all acts that may constitute "torture" or "arbitrary detention" in order to recognize certain conduct as actionable misconduct under that rubric. Accordingly, any act by the defendant which is proscribed by the Constitution of the United States and by a cognizable principle of international law plainly falls within the rubric of "cruel, inhuman or de-

grading treatment" and is actionable before this Court under § 1350.

Plaintiffs contend that defendant is responsible for "cruel, inhuman or degrading treatment" because the actions taken at his direction "had the intent and the effect of grossly humiliating and debasing the plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, breaking physical or moral resistance, and/or forcing them to leave their homes and country and flee into exile[.]" (Xuncax Complaint ¶ 76.) This general allegation may be divided into two categories.

■ The first category includes acts by soldiers under defendant's command that caused a plaintiff to: (1) witness the torture (Xuncax and Doe) or severe mistreatment (Diego–Francisco) of an immediate relative; (2) watch soldiers ransack their home and threaten their family (Xuncax and Francisco–Marcos); (3) be bombed from the air (the Ruiz–Gomez brothers); or (4) have a grenade thrown at them (Callejas). I have no difficulty concluding that acts in this category constitute "cruel, inhuman or degrading treatment" in violation of international law. *See generally The Greek Case*, Y.B.Eur.Conv. on H.R. 186, 461–65 (1969) (describing cases where political detainees were subjected to acts of intimidation, humiliation, threats of reprisal against relatives, presence at torture of another, and interference with family life in violation of Article 3 of the European Convention on the Protection of Human Rights and Fundamental Freedom).

The second category consists of the claim that, as a consequence of Gramajo's acts, plaintiffs "were placed in great fear for their lives ... and were forced to leave their homes and country and flee into exile." [34] Although I find that all plaintiffs have made such a showing, I do not agree that this showing *independently* constitutes "cruel, inhuman and degrading treatment" in violation of the law of nations and actionable under § 1350.[35] The claim of Manuel–Mendez, who

---

**34.** Xuncax Preliminary Statement, Fourth Claim for Relief (from Cruel, Inhuman or Degrading Treatment) at 24, ¶ 77.

**35.** The closest analogy to plaintiffs' forced exile claim appears to be a genocide claim, which

plaintiffs have not chosen to present. Like "torture or other cruel, inhuman, or degrading treatment or punishment," genocide is a violation of customary international human rights law. *See Restatement (Third) of Foreign Relations Law* § 702, reporters' notes 3 & 11 (1987). "Geno-

does not allege that any particular act of the defendant's agents was directed at him personally, presents the distinction most starkly.

Because Manuel–Mendez was not formally "punished," unlike the petitioners in *Korematsu v. United States*, 323 U.S. 214, 219–20, 65 S.Ct. 193, 195–96, 89 L.Ed. 194 (1944) and *Trop v. Dulles*, 356 U.S. 86, 101–02, 78 S.Ct. 590, 598–99, 2 L.Ed.2d 630 (1958), support for his interpretation of "cruel, inhuman and degrading treatment" lies in the prohibition of discriminatory deportation or expulsion. *See* Universal Declaration of Human Rights, art. 9, G.A.Res. 217A(III), U.N. GAOR, 3d Sess., Supp. No. 71, art. 9, U.N. Doc. A/810 (1948) ("[n]o one shall be subjected to arbitrary arrest, detention or exile"); *id.* art. 13 ("[e]veryone has the right to ... residence within the borders of each state"); *id.* art. 15 ("[n]o one shall be arbitrarily deprived of his nationality"); Covenant on Civil and Political Rights, 999 U.N.T.S. 171, Art. 12 (right to freedom of residence within a country subject only to restrictions provided by law, necessary to protect national security, public order, health, morals or rights and freedoms of others);[36] American Convention on Human Rights, 9 I.L.M. 101, Art. 20, 22 (1970) (no one to be arbitrarily deprived of nationality; every person has the right to reside in state party subject to provisions of law);[37] Aff. of Int'l Law Scholars at 33–34 ("[t]here is a consensus among international law publicists" that "[d]eportation or expulsion from ... one's own country without due process or

under exceptional circumstances such as discriminatory application of law or the intentional infliction of physical or mental suffering" constitutes cruel, inhuman or degrading treatment). As explained by P. van Dijk & G.J.H. van Hoof:

> Via Article 3 certain rights and freedoms which are not included as such in the [European Convention on the Protection of Human Rights and Fundamental Freedom] may be brought under its protection, or at any rate the argument that they are implicitly protected by the Convention may thus be consolidated.

> The clearest example is furnished by the admission and expulsion or extradition of aliens. The Convention does not contain a general right of admission to a certain country and also not a right to asylum, while Article 4 of Protocol no. 4 prohibits only *collective* expulsion of aliens and Article 1 of Protocol no. 7 only contains certain procedural guarantees against expulsion. The refusal of admission to or the expulsion from a country may, however, constitute an inhuman treatment in the sense of Article 3, for instance on account of the physical condition of the person concerned or because it might result in the person in question being separated from a person or group of persons with whom he has a close link, even apart from the protection of family life under Article 8.

---

cide" is defined in Article II of the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention") as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
> (a) Killing members of the group;
> (b) Causing serious bodily or mental harm to members of the group;
> (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
> (d) Imposing measures intended to prevent births within the group;
> (e) Forcibly transferring children of the group to another group.

*Restatement* § 702 cmt. d; *cf.* 18 U.S.C. § 1091(a) (defining "genocide" as a basic offense). The Affidavits submitted by the *Xuncax* plaintiffs indicate that defendant supported, and probably directed, a genocidal campaign against

the Kanjobal Indians of Guatemala through acts falling in categories (a) through (c) above. (*See* Manuel Aff., Nairn Aff., Loucky Aff., Xuncax Mot. Default Exs. K, L, N.)

**36.** As of December 1992, this Covenant was accepted by 115 states. *See* Katherine C. Hall, *International Human Rights Law: A Resource Guide* 13 (1993). The United States Senate 1992 consent to ratification was given with "reservations, understandings, and declarations." *Id.* However, the recognition by this country of the particular principle under discussion has been sufficiently established, *see, e.g., Trop v. Dulles*, 356 U.S. 86, 101–02, 78 S.Ct. 590, 598–99, 2 L.Ed.2d 630 (1958).

**37.** As of December 1992, 29 states were parties; the United States has signed, but not ratified the accord. *See* Katherine C. Hall, *International Human Rights Law: A Resource Guide* 45 (1993).

*Theory and Practice of the European Convention on Human Rights* 235–37 (1990) (footnotes omitted).

Similarly, in *East African Asians v. United Kingdom*, 3 Eur. H.R.Rep. 76 at ¶¶ 207–209 (1973) (obtained from LEXIS, Intlaw library, Ilm file), the European Commission of Human Rights concluded that the refusal of British authorities to admit citizens of the United Kingdom and colonies (or allow them to stay permanently) based on their color or race constituted degrading treatment in violation of Article 3.

Guatemala, however, has neither refused to admit Manuel–Mendez nor refused to allow him to stay. Instead, the acts of the defendant *on others* had the *effect* of forcing Manuel–Mendez into exile. Plaintiffs have offered no decision of the international legal community holding that such "constructive" expulsion constitutes "cruel, inhuman or degrading treatment" as opposed to "genocide." In this connection, it bears emphasizing that the United States Constitution would not provide Manuel–Mendez with a basis of recovery under the Fourth Amendment because he was never in the custody of the defendant, nor under the Eighth Amendment because he was not directly expelled from Guatemala as a penalty.[38]

While it is true that blind adherence to formal labels should be avoided, *see, e.g., Trop v. Dulles*, 356 U.S. at 94, 78 S.Ct. at 594–95 ("How simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them!"), caution is required in identifying new violations of *jus cogens*. Thus, despite the compelling character of plaintiffs' claims, I am reluctant to stretch the category of "cruel, inhuman or degrading treatment" to encompass constructive expulsion. This is especially so where many authorities, including the European Court of Human Rights, *see Ireland v. United Kingdom*, 2 Eur. H.R. Rep.

25, 80 (1978), suggest that "cruel, inhuman or degrading treatment" essentially refers to less readily cognizable forms of what might otherwise be recognized as torture. *See, e.g.,* Convention Against Torture, S.Exec.Rep. 30, 101st Cong., 2d Sess. 13 (1990) ("torture is at the extreme end of cruel, inhuman and degrading treatment"); Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Article 1(2), G.A.Res. 3452, 30 U.N. GAOR Supp. No. 34 ("[t]orture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment"). As intimated in my discussion of the substantive law to be applied in this case, Part III.C.1, above, 28 U.S.C. § 1350 does not provide warrant for judges to engage in law making when divining the "law of nations." To recognize "constructive expulsion" as a tortious violation of international law would involve such law making.

Accordingly, I find that this Court has jurisdiction under § 1350 to hear the claims of plaintiffs Xuncax, Diego–Francisco, Doe, Pedro–Pascual, Francisco–Marcos, the Ruiz–Gomez brothers, and Callejas for recovery in tort for the injuries suffered as a result of acts directed by the defendant. In addition, I will consider the fact that they were forced into exile as a result of defendant's acts in assessing compensatory damages. I do not find jurisdiction under § 1350 to hear Manuel–Mendez's claim for constructive expulsion, however. Nor will I entertain his claim for intentional infliction of emotional distress under the doctrine of supplemental party jurisdiction.[39]

**b. Claims on Behalf of Third Parties**

By definition, the *Xuncax* plaintiffs' claims for summary execution and disappearance are based on harm to a third party. Section 1350 is silent concerning a plaintiff's standing to bring suit based on injury to another. Generally, if a federal

---

**38.** I note that Manuel–Mendez would appear eligible for asylum under United States law. *See, e.g., Cordero–Trejo v. INS*, 40 F.3d 482 (1st Cir. 1994) (holding denial of asylum to Guatemalan refugee unsupported by substantial evidence). The fact that he has a "well-founded fear of persecution," however, does not necessarily imply that he was subjected to "cruel, inhuman or degrading treatment" in violation of a peremptory norm of international law.

**39.** *See* Part III.E.1, *infra*.

statute provides a cause of action without specifying important details such as the limitation period or survivorship, courts look to analogous state statutes. *See, e.g., Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1941–42, 85 L.Ed.2d 254 (1985); *Forti I,* 672 F.Supp. at 1547. The Rules of Decision Act, 28 U.S.C. § 1652, provides: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." The Supreme Court has explained, "[g]iven our longstanding practice of borrowing state law, and the congressional awareness of this practice, we can generally assume that Congress intends by its silence that we borrow state law." *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 147, 107 S.Ct. 2759, 2763, 97 L.Ed.2d 121 (1987).[40]

Federal rather than state law should be used only if application of the state law would defeat the purpose of the federal statute, *cf. Bell v. City of Milwaukee,* 746 F.2d 1205, 1236–40 (7th Cir.1984) (holding Wisconsin wrongful death statutes that did not permit recovery by victim's estate for loss of life were inconsistent with Section 1983), or if there is a special federal need for uniformity. For example, in *Agency Holding Corp.,* the Supreme Court held that the four-year statute of limitations for Clayton Act civil suits should apply to civil RICO enforcement actions rather than the relevant state statute of limitations. The Court explained:

Although the large majority of civil RICO complaints use mail fraud, wire fraud or securities fraud as the required predicate offenses, a not insignificant number of complaints allege criminal activity of a type generally associated with professional criminals such as arson, bribery, theft and public corruption.... Moreover, RICO is designed to remedy injury caused by a

pattern of racketeering and "[c]oncepts such as RICO 'enterprise' and 'pattern of racketeering activity' were simply unknown to common law."

Under these circumstances, therefore, as with § 1983, a uniform statute of limitations is required to avoid intolerable "uncertainty and time-consuming litigation." 483 U.S. at 149–50, 107 S.Ct. at 2763–64 (citations omitted).

The same approach was taken in *Forti I* and *Marcos II.* In *Forti I,* the court had to decide which statute of limitations to apply to a suit under 28 U.S.C. § 1350. The court followed the analysis of *Agency Holding Corp.,* explaining:

To determine whether to apply a federal or state limitations period, the Court must first identify the closest analogies under both federal and state law.... The types of claims found by this Court to be actionable under 28 U.S.C. § 1350—official torture, prolonged arbitrary detention, and summary execution—seek damages for personal injuries and sound in tort. Thus the closest analogy in state law is the recovery of damages for personal injuries.

The closest analogy in federal law is not as easily ascertained, and depends in large part upon determining the most important characteristic of a claim under 28 U.S.C. § 1350 for purposes of applying an appropriate limitations period.

672 F.Supp. at 1547–48.

After examining the Jones Act and the Civil Rights Act, the court held that "the federal statute most analogous to 28 U.S.C. § 1350 is 42 U.S.C. § 1983." 672 F.Supp. at 1548. Because state statute of limitations are used in Section 1983 actions, the court found "no compelling reason to 'look beyond' state law for a limitations period." *Id.*

In *Marcos II,* 25 F.3d at 1476, the court used the Eighth Amendment and 42 U.S.C. § 1983 to determine whether plaintiffs' cause

---

40. For example, in Civil Rights actions under Section 1983, courts apply the statute of limitations for the state in which the action is brought. *Cf. Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (Marshall, J.) (holding court could apply Louisiana survivorship law that caused civil rights action to abate upon

death of plaintiff who did not leave a spouse, children, parents or siblings). Civil rights cases are not directly analogous to cases under the Alien Tort Claims Act because 42 U.S.C. § 1988(a) expressly specifies the method of selection of the applicable body of law for actions under § 1983.

of action against Marcos abated on the death of Marcos.

In this case, I find the most analogous federal statute to be the Torture Victim Protection Act, 28 U.S.C. § 1350 note § 2(a)(2), which provides that the victim's "legal representative" or "any person who may be a claimant in an action for wrongful death," may recover based on an extrajudicial killing. In explaining this provision, the House of Representatives Committee Report stated "[c]ourts may look to state law for guidance as to which parties would be proper wrongful death claimants." H.Rep. No. 256, 102d Cong., 1st Sess. 87 (1991). The Senate Committee Report elaborated:

> The legislation permits suit by the victim or the victim's legal representative or a beneficiary in a wrongful death action. The term "legal representative" is used only to include situations in which the executor or executrix of the decedent's estate is suing or in which an individual is appearing in court as a "friend" of the victim because of that victim's mental or physical incapacity or youthful age. The term "beneficiary in a wrongful death action" is generally intended to be limited to those persons recognized as legal claimants in a wrongful death action under Anglo–American law.

S.Rep. No. 249, 102d Cong., 1st Sess. 7 (1991) (footnote omitted). In an important footnote, the Senate Committee Report added "[w]here application of Anglo–American law would result in no remedy whatsoever for an extrajudicial killing, however, application of foreign law recognizing a claim by a more distant relation in a wrongful death action is appropriate." *Id.* n. 10 (citation omitted). As an example, the Report cited *In re Air Crash Disaster Near New Orleans, Louisiana, on July 9, 1982,* 789 F.2d 1092, 1097–98 (5th Cir.1986), in which the court allowed a nephew's claim even though Louisiana law provided no remedy, *rev'd in part on other grounds,* 821 F.2d 1147, 1170 (5th Cir.1987), *vacated on other grounds,* 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989).

The Massachusetts Wrongful Death Act, which the TVPA directs me to, also is the most analogous state statute to 28 U.S.C. § 1350. Under the Massachusetts Wrongful Death Act, spouses and children generally are the only parties who may recover damages. Mass.Gen.L. ch. 229, § 1. Thus, Xuncax, Doe, and Callejas have a cause of action under 28 U.S.C. § 1350 based on the execution of a spouse (Xuncax) or parent (Doe) or on the disappearance of a parent under circumstances indicating the parent has been killed (Callejas).

Other relatives may recover only if they are the "next of kin." Mass.Gen.L. ch. 229, § 1(4). "Next of kin" is the decedent's closest blood relative as defined by the intestacy law, Mass.Gen.L. ch. 190, § 3. *See Poyser v. United States,* 602 F.Supp. 436, 440 (D.Mass. 1984) (Tauro, J.).

A sibling may recover for wrongful death only if the decedent leaves no parent or issue. Mass.Gen.L. ch. 190, § 3(5). Pedro–Pascual states that her parents are still living, (Pedro–Pascual Decl. ¶ 3, Xuncax Ex. D.) Thus, she would have no cause of action under the Massachusetts Wrongful Death Act based on the execution of her sister.

Guatemalan law, however, leads to a slightly different result. Plaintiffs' expert on this issue explains:

> Under Guatemalan law, the right to sue for damages in a cause of action sounding in tort belongs to the victim (Civ.C., Art. 1645). In an action for wrongful death, the second paragraph of Article 1655 of the Guatemalan Civil Code provides that the right of action belongs to the heirs of the victim or to those who are entitled by law to receive economic support from the victim (*alimentos*). Under Article 283 of the Guatemalan Civil Code, the obligation to provide, and the right to receive, economic support extends to spouses, parents, children, and siblings.

(Garro Aff. at 12–13, Xuncax Mot. Default Ex. O (citations omitted).) Article 283 of the Civil Code provides that: "[s]pouses, ascendants, descendants, and siblings are reciprocally bound to support each other." *Id.*

Because a sibling generally may recover under Guatemalan law but not under Massachusetts law, I must decide whether to apply the Torture Victim Protection Act, and

therefore Guatemalan law, or the Massachusetts Wrongful Death Act. I choose to rely on the Torture Victim Protection Act for reasons similar to those expressed by the Supreme Court in *Agency Holding Corp.*, and in my discussion in Part III.C.1, above, of the substantive law to be applied to 28 U.S.C. § 1350 actions. Just as " '[c]oncepts such as RICO 'enterprise' and 'pattern of racketeering activity' were ... unknown to common law,' " 483 U.S. at 150, 107 S.Ct. at 2764 (citation omitted), so are concepts such as "torture" and "disappearance" unfamiliar to the law of the Commonwealth. Simply put, municipal law is ill-tailored for cases grounded on violations of the law of nations. Thus, Pedro–Pascual has stated a cause of action under 28 U.S.C. § 1350 for the execution of her sister.

■ A closer question is whether Xuncax, Doe and Diego–Francisco can recover for claims of arbitrary detention or torture asserted on behalf of a husband, father, and wife, respectively. Under Massachusetts law, an individual may recover for an injury to a spouse if that individual can show loss of consortium, *see Diaz v. Eli Lilly & Co.*, 364 Mass. 153, 302 N.E.2d 555 (1973). But the individual cannot bring an action directly on behalf of the injured spouse unless appointed as the legal representative of the injured spouse. None of the plaintiffs has asserted appointment as a legal representative. The TVPA, which is the federal statute most analogous to the Alien Tort Claims Act, is conspicuously silent on the question of whether a third party may bring suit on behalf of a *tortured* relative. Instead, it authorizes such actions only for summary executions, *see* 28 U.S.C. § 1350 note § 2(a)(2). In addition, under Guatemalan law, with the exception of wrongful death, "the right to sue for damages in a cause of action sounding in tort belongs to the victim," (Garro Aff. at 12–13). Thus, I find that under either federal or state law, plaintiffs cannot recover on behalf of their relatives for arbitrary detention or torture.

**c. Statute of Limitations and Venue**

In his conclusory Answer, the defendant summarily asserts that the *Xuncax* complaint is barred by the statute of limitations, and that venue is improper in this District. These defenses are without merit.

(i) *Statute of Limitations*

■ Defendant waived his statute of limitation defense by failing to pursue it (and defaulting) in this case. *See, e.g., Bradford–White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1160–61 (3d Cir.1989) (holding statute of limitations waived despite fact that defendant raised issue in answer because defendant did not further press the defense), *cert. denied*, 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989).

Even if the defense had not been waived, these complaints overcome any statute of limitations defense. As discussed in Part III.C.2.b, above, a federal court generally looks to analogous state law for rules of decision not otherwise specified in the federal statute on which the suit is based. Alternatively, if there are special needs for uniformity, the court may apply the most analogous federal statute. Plaintiffs' claims would survive under either analysis.

■ Massachusetts has a three year statute of limitations for personal injury actions. Mass.Gen.L. ch. 260, § 2A. Massachusetts also has a borrowing statute, however, which provides that, where the defendant is a nonresident, the statute of limitations does not begin to run until the defendant "comes into the commonwealth." Mass.Gen.L. ch. 260, § 9. Because plaintiffs brought suit within three years of the date defendant entered the Commonwealth, (*Xuncax* Complaint filed June 6, 1991, ¶ 8 (stating Gramajo "came to the United States on or about September 1990")), their action is timely under Massachusetts law.

The only exception to the Massachusetts borrowing rule is if the cause of action "was barred by the laws of any state or country while he resided therein." *Id.* This exception does not apply to the present case because Guatemalan law allowed plaintiffs twenty years to bring suit against the defendant. (*See* Garro Aff. (Xuncax) Ex. O at 16–18.)

Plaintiffs' claims also are timely under the most analogous federal statute, the TVPA,

which contains a ten year statute of limitations. *See* TVPA § 2(c), 28 U.S.C. § 1350 note.

### (ii) *Venue*

▮ The claims of international law violation which form the foundation for federal jurisdiction involve conduct recognized by the community of nations. There is universal jurisdiction permitting the United States to provide a remedy for such claims through its courts, even where the conduct complained of took place entirely outside the United States. *See Restatement (Third) of Foreign Relations Law* § 404 & cmt. b.

▮ Venue is proper in this District because defendant, an alien, was served with process while he was present in Massachusetts on a visit from Guatemala. *See* 28 U.S.C. § 1391(b)(3) (venue proper in federal question suit in "a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought"); 28 U.S.C. § 1391(d) ("[a]n alien may be sued in any district").

### D. *Independent Federal Subject Matter Jurisdiction Under 28 U.S.C. § 1331*

Both Ortiz and the *Xuncax* plaintiffs also assert that this Court has jurisdiction in this case under the general federal question statute, 28 U.S.C. § 1331. Because I find jurisdiction over the *Xuncax* plaintiffs' claims under the Alien Tort Statute, and over plaintiff Ortiz's claims under the TVPA, I need not definitively decide whether their claims would support the exercise of jurisdiction independently under the federal question statute. I do, however, consider it appropriate here to register my reservations regarding the use of § 1331 federal question jurisdiction in cases such as these.

▮ Congress plainly has the constitutional authority to grant the courts the power to hear cases based on violations of United States treaties or international law. Whether a plaintiff invokes § 1350 on the basis of a tort committed in violation of a U.S. treaty or in violation of the law of nations, the plaintiff's case will "arise under" federal law for purposes of Article III. Where the plaintiff alleges a violation of a United States treaty, the federal court is required to interpret and examine the content of a United States treaty. Thus, such cases unquestionably contain an "original federal ingredient," *see Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), and therefore fall inside the permissible scope of Article III. Similarly, where the plaintiff alleges a violation of the law of nations, the federal court is required to investigate and discern principles of international law, and it is well settled that the body of principles that comprise customary international law is subsumed and incorporated by federal common law. *See The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820); *Marcos Estate I,* 978 F.2d 493, 502 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2960, 125 L.Ed.2d 661, (1993); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 810 (D.C.Cir.1984) (Bork, J., concurring); *Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980); *see also Restatement (Third) of Foreign Relations Law* § 702 cmt. c. Thus, cases in which a plaintiff attempts to invoke § 1350 by alleging a violation of international law necessarily require federal courts to examine *federal* law at the threshold, insofar as international law *is* part of federal law. Such cases therefore contain an "original federal ingredient" and fall well within the scope of Article III. *See Osborn; Tel–Oren,* 726 F.2d at 787 n. 19 (Edwards, J., concurring).

▮ That being said, the question whether claims for violations of international law might independently support "arising under" federal question jurisdiction through 28 U.S.C. § 1331 remains unresolved. The Ninth Circuit has observed that "[t]he 'Arising Under' Clause of Article III is construed differently, and more broadly, than the 'arising under' requirement for federal question jurisdiction". *Marcos Estate I,* 978 F.2d at 502; *see also Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 495, 103 S.Ct. 1962, 1972, 76 L.Ed.2d 81 (1983) (limitations on § 1331 jurisdiction not the same as limitations on constitutional power of Congress to confer jurisdiction on federal courts). To be

sure, cases arising under the federal common law (as well as those arising under federal positive law) have been found to support statutory federal question jurisdiction, *see, e.g., Illinois v. City of Milwaukee,* 406 U.S. 91, 98–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972), *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 389, 79 S.Ct. 468, 489, 3 L.Ed.2d 368 (1959) (plurality opinion), and federal common law embraces international law. Nevertheless, the weight of authority, which I find persuasive, suggests that because international law is not itself a source of private rights of action—as is, for example, the common law of contracts or torts—a plaintiff's claims for violation of human rights cannot ordinarily "arise under" federal-common-law-cum-international-law and consequently, § 1331 jurisdiction does not extend to such claims. *See, e.g., Tel–Oren,* 726 F.2d at 779–80 n. 4 (Edwards, J., concurring); *id.* at 811 (Bork, J., concurring); *Handel v. Artukovic,* 601 F.Supp. 1421, 1428 (C.D.Cal.1985) (to imply cause of action from international law would defeat critical right of sovereign to determine whether and how international rights should be enforced domestically). *See also Restatement (Third) of Foreign Relations Law* § 703 cmt. c ("[i]nternational human rights agreements generally require a state party to provide [direct international] remedies").

In the absence of an express Congressional directive—of the type I have found in § 1350 and in the TVPA—providing a private right of action arising under federal law for a violation of a treaty or of international law norms, the federal courts should not imply one. Consequently, § 1331 standing alone would not provide plaintiffs with jurisdiction in this Court in these matters.

### E. *Xuncax and Ortiz Plaintiffs' Municipal Tort Claims*

The municipal tort claims asserted by plaintiff Ortiz and those asserted by the *Xuncax* plaintiffs may be treated in the same discussion. The *Xuncax* municipal tort claims, however, are brought under the sup-

plemental jurisdiction of this Court while the Ortiz municipal tort claims invoke the Court's diversity jurisdiction.

### 1. Supplemental Jurisdiction

 As a preliminary doctrinal point concerning federal jurisdiction, I note that in order to maintain subject matter jurisdiction, it is not always necessary that original federal jurisdiction be found to lie separately for each individual plaintiff or with respect to each of the several and distinct claims asserted by the plaintiffs. The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides that when a federal district court has original subject matter jurisdiction over certain claims in an action, the court:

> "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

28 U.S.C.S. § 1367(a) (Supp. May 1992). The statute effectively codifies the rule of *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), with respect to jurisdiction over pendent claims and supersedes and overrules the holding of *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), with respect to jurisdiction over pendent parties. Section 1367 contemplates the exercise by federal courts not only of jurisdiction over pendent and ancillary claims, but over pendent and ancillary parties as well.

Although the notion of "pendent parties" typically refers to impleaded third-party defendants,[41] § 1367 on its face contains no distinction between defendants and plaintiffs for purposes of supplemental jurisdiction. Moreover, the general concerns that underlie § 1367—e.g., the desire for judicial economy and the prevention of piecemeal litigation—apply whether the parties with respect to whom supplemental jurisdiction is sought are

---

**41.** In *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), for example, the plaintiff in an action filed originally against the United States under the Federal Tort Claims Act wanted to implead a local utility company against which she sought to assert only state law claims.

defendants or plaintiffs. *Cf. Godfrey v. Perkin–Elmer Corp.*, 794 F.Supp. 1179, 1185 (D.N.H.1992) (finding pendent party plaintiff jurisdiction over husband's claim for loss of consortium in Title VII suit brought by wife); *Arnold v. Kimberly Quality Care Nursing Servs.*, 762 F.Supp. 1182, 1185 (M.D.Pa.1991) (same).

■ The *Xuncax* plaintiffs all suffered their injuries pursuant to the defendant's brutal policy of extermination and suppression. Nevertheless, I cannot say that their otherwise disparate claims "form part of the same case or controversy" within the meaning of Article III without unduly expanding the *United Mine Workers v. Gibbs* concept of "common nucleus of operative fact." With the exception of the Ruiz–Gomez brothers, the claims of the individual plaintiffs in this case are not as closely related as the claim of a husband who suffers loss of consortium based on his wife's constructive discharge (and resulting emotional distress) and the claim of his wife. Thus, I decline to exercise supplemental jurisdiction over plaintiff Manuel–Mendez. Supplemental jurisdiction over the municipal law claims of the remaining plaintiffs, however, is well founded.

## 2. Choice of Law

Under the rule of *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), a federal district court must apply the choice-of-law principles of its forum state in order to establish the substantive rule of decision for a plaintiff's non-federal claims. Thus, I must apply Massachusetts choice-of-law rules to determine which substantive tort law should be applied to the *Xuncax* plaintiffs' pendent municipal tort claims, and to Ortiz's municipal tort claims, over which I have diversity jurisdiction under 28 U.S.C. § 1332(a)(2).

■ Massachusetts has abandoned the mechanical rule of *lex loci delicti* in favor of the more functionally-oriented "interest analysis" or "most significant relationship"

approach of the Second *Restatement*.[42] *See Bi–Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir.1985); *A. Johnson & Co. v. Aetna Cas. & Surety Co.*, 741 F.Supp. 298, 299 (D.Mass.1990), *aff'd*, 933 F.2d 66 (1st Cir.1991). Applying this functional approach, it is clear that Guatemalan law should be applied to the municipal tort claims asserted by the *Xuncax* plaintiffs. Those plaintiffs were all Guatemalan domiciliaries at the time their injuries occurred, and their only contact with the United States arose from their being forced into exile here.

■ Unlike the *Xuncax* plaintiffs, Plaintiff Ortiz is a United States citizen domiciled in Kentucky. All of the "contacts" relevant for Massachusetts choice-of-law purposes, however, are in Guatemala. To be sure, the state of Kentucky has an identifiable interest in seeing that its domiciliaries be compensated for debilitating injuries received abroad; but in the circumstances of this case, Guatemala has an even greater interest (at least for abstract purposes of choice of law) in deterring and eradicating assaultive behavior within its own borders, regardless of the nationalities of the victim or the perpetrator. I therefore conclude that Guatemalan law should be applied to plaintiff Ortiz's municipal tort claims—excluding her claim for defamation.

Under the "choice-influencing" approach to conflicts of law favored in Massachusetts law, Kentucky law should apply to Ortiz's defamation claim: the plaintiff has her domicile in Kentucky; her reputation was harmed most severely in Kentucky, where her convent is located; and defendant's statements were published in Kentucky (and nationwide). The approach of the Second Restatement similarly counsels in favor of applying Kentucky law: "When a natural person claims that he has been defamed by an aggregate [i.e., multistate] communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was

---

42. *Restatement (Second) of Conflict of Laws* § 145 (1971). The Second *Restatement* does express a vestigial preference for the *lex loci* rule in actions for personal injury, however. *See Restatement (Second)* § 146 ("In an action for per- sonal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship …").

published in that state." *Restatement (Second) of Conflict of Laws* § 150; *see also Continental Cablevision v. Storer Broadcasting Co.*, 653 F.Supp. 451, 455 (D.Mass.1986). Thus, applying Massachusetts choice-of-law principles, I find that the law of Kentucky—plaintiff Ortiz's domicile—should be applied to determine the standard and measure of defendant's liability for defamation.

### 3. Defendant's Liability under Guatemalan Law for Wrongful Death, Assault and Battery, False Imprisonment, and Intentional Infliction of Emotional Distress

To determine the content and meaning of the laws of a foreign country, a federal court may look to "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1; *see also Overseas Development Disc Corp. v. Sangamo Constr. Co.*, 840 F.2d 1319, 1324 (7th Cir.1988) (citing *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir.1987)). In this action, plaintiffs have provided the court with an affidavit containing the testimony of Professor Alejandro M. Garro regarding the provisions and principles of the Guatemalan civil law that are pertinent to this case. *See* Aff. of Alejandro Garro, attached as Exhibit L to Plaintiff Ortiz's Exh. in Support of Def. Judgt. [hereinafter "Garro Aff. (Ortiz)"] and attached as Exhibit O to *Xuncax* Plaintiffs' Exh. in Support of Def. Judgt [hereinafter "Garro Aff. (Xuncax)"]. I rely on the written testimony of Professor Garro in forming my conclusions about Guatemalan law.

■ Tort liability in the Guatemalan legal system is founded upon Article 1645 of the Civil Code,[43] which provides:

Any person who causes damage or harm to another, either with the intention to cause harm or due to lack of care or imprudence, is obligated to make it good, unless that person establishes that the damage or harm resulted from the fault or inexcusable negligence of the victim.

Garro Aff. (Ortiz) ¶¶ 17, 18. The three elements of tort liability in Guatemalan law are (1) harm to the plaintiff, (2) fault on the part of the defendant, either in the form of negligence or intent to cause harm, and (3) a causal link between the defendant's fault and the harm suffered by the plaintiff. *See* Garro Aff. (Ortiz) ¶ 18. Generally, the plaintiff bears the burden of proving that she has suffered some harm caused by the defendant, but once the plaintiff has satisfied this burden, there arises a rebuttable *presumption* that the defendant acted with the requisite degree of fault. *See id.* at ¶ 19. In cases where the defendant allegedly caused the death of a victim, Article 1655 of the Civil Code provides that the victim's heirs and lineal relatives "may seek compensation for damages." Garro Aff. (Xuncax) ¶¶ 30–31.

It is unclear whether under Guatemalan law a plaintiff has a single cause of action under Article 1645 of the Civil Code or whether a plaintiff has separate and distinct causes of action comparable to the distinct common law torts of assault and battery, wrongful death, false imprisonment, and intentional infliction of emotional distress. Prof. Garro states cryptically that "th[e] broad notion of tort [contained in Art. 1645 of the Civil Code] encompasses the narrower list of specific torts recognized by the common law (e.g., assault and battery, negligence)," Garro Aff. (Ortiz) ¶ 17, but it is not clear what Garro means by "encompass." Article 1667 of the Civil Code *does* appear, however, to provide plaintiffs with an independent cause of action for false imprisonment or arbitrary detention. *See* Garro Aff. (Ortiz) ¶ 27.

The Guatemalan Civil Code does not provide immunity to former public officials with respect to liability for civil wrongs committed while the official was performing his duties. *See id.* at ¶ 25. In fact, the Guatemalan Constitution of 1985 explicitly provides that a public official who through the violation of law causes harm to an individual shall be held jointly and severally liable with the state or instrumentality in which he serves. *See id.* (quoting Art. 155 of Guatemalan Const. of

---

**43.** Guatemala is a civil law jurisdiction. Thus, the courts of that country may impose liability upon a defendant only if such liability is authorized by a specific provision of the civil code.

1985). Furthermore, the Civil Code contains a separate provision providing for recovery to victims of false imprisonment. Article 1667 provides that a "person who carries out an illegal order o[f] detention or imprisonment and the person who orders it shall be jointly and severally liable for the damage caused." Garro Aff. (Ortiz) ¶ 27.

Assuming the facts adduced by the plaintiffs in support of default judgment to be true, I conclude that there is abundant evidence to support the conclusion that the plaintiffs suffered intense harm, that such harm was caused by the acts of the defendant, and that the defendant acted with the degree of fault required to trigger liability under Articles 1645, 1655 and 1667 of the Guatemalan Civil Code and Article 155 of the Guatemalan Constitution of 1985.

#### 4. Plaintiff Ortiz's Claim for Defamation

 Similarly, there can be no question that the defendant defamed plaintiff Ortiz and that the plaintiff is therefore entitled to an award of compensatory and punitive damages. Under Kentucky defamation law:

> The rule is that actionable words are divided into two classes; (a) those actionable per se which necessarily damage plaintiff; and (b) those which are actionable in consequence of extrinsic facts showing the circumstances under which they were written or spoken and the damages resulting therefrom.

*Digest Publishing Co. v. Perry Publishing Co.*, 284 S.W.2d 832, 834 (Ky.1955) (citation omitted).

In *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ct.App.Ky.1981), the court explained:

> Slander per se differs from ordinary slander in that the words themselves, absent any development of extrinsic facts or circumstances, are actionable. Such words must tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people and to deprive him of their friendship, intercourse and society. But it is not necessary that the words imply a crime or impute a viola-

tion of laws, or involve moral turpitude or immoral conduct.

(citations omitted). Even assuming, *arguendo*, that defendant's statements that plaintiff, an Ursuline nun, had concocted her abduction and torture story to cover up a lover's quarrel, were not slander per se, I conclude that, when considering the surrounding circumstances, defendant's statements clearly were actionable under Kentucky law and plaintiff Ortiz has averred sufficient damage resulting from defendant's defamatory statements, (Ortiz Aff. ¶ 72), to recover in this suit.

### IV. ASSESSMENT OF DAMAGES

#### A. *Xuncax Plaintiffs' Claims Under International Law*

 All of the *Xuncax* plaintiffs seek damage recovery under § 1350 for torts committed in violation of international law. Their claims may be grouped as follows:

(1) *Summary Execution:* Plaintiffs Xuncax, Doe and Pedro–Pascual, "on their own behalf and on behalf of their next-of-kin," (Complaint ¶ 59), seek compensatory damages "in excess of $2,000,000" each and punitive damages "of at least $5,000,000" each. (Complaint ¶ 62 & ¶ 63.)

(2) *Disappearance:* Plaintiff Callejas, "on his own behalf and on behalf of his father," seeks compensatory damages "in excess of $2,000,000" and punitive damages "of at least $5,000,000." (Complaint ¶ 67 & ¶ 68.)

(3) *Torture:* Plaintiffs Xuncax, Doe and Diego–Francisco, "on their own behalf and on behalf of their next-of-kin," (Complaint ¶ 69), seek compensatory damages "in excess of $2,000,000" each and punitive damages "of at least $5,000,000" each. (Complaint ¶ 73 & ¶ 74.)

(4) *Arbitrary Detention:* Plaintiffs Xuncax, Doe and Diego–Francisco, "on their own behalf and on behalf of their next-of-kin," (Complaint ¶ 79), seek compensatory damages "in excess of $1,000,000" each and punitive damages "of at least

$1,000,000" each. (Complaint ¶ 82 & ¶ 83.)

(5) *Cruel, Inhuman, or Degrading Treatment:* Each *Xuncax* plaintiff seeks compensatory damages "in excess of $1,000,-000" and punitive damages "of at least $1,000,000" on this count. (Complaint ¶ 77 & ¶ 78.)

Having previously delineated jurisdiction over these claims in Part III.C, above, I conclude that recovery is warranted for each plaintiff except Manuel–Mendez, albeit not in the precise amounts sought. One need only refer to the facts outlined earlier regarding each plaintiff's experience to establish that their respective claims for torture, summary execution, disappearance and arbitrary detention are amply supported. Similarly, it is clear that each of the plaintiffs (except for Manuel–Mendez and Pedro–Pascual) has suffered "cruel, inhuman or degrading treatment" in violation of international law.

Regarding the extent of the recovery warranted, a review of the developing body of federal common law precedent which has allowed both compensatory and punitive damages for such harms,[44] along with consideration of both the grievous nature of the instant harms as well as the clear aspiration of the community of nations to put an end to such offenses, leads me to conclude that the following damages—calibrated in an effort to reflect the difference in severity in the treatment each plaintiff experienced—are both reasonable and appropriate:

(1) *Summary Execution:* $2,000,000 in compensatory damages and $5,000,000 punitive damages each for plaintiffs Xuncax, Doe, and Pedro–Pascual, on behalf of their husband, father, and sister, respectively.

(2) *Disappearance:* $2,000,000 in compensatory damages and $5,000,000 in puni-

tive damages for plaintiff Callejas, on behalf of his father.

(3) *Torture:* $1,000,000 in compensatory damages and $2,000,000 in punitive damages for plaintiff Diego–Francisco on his own behalf.

(4) *Arbitrary Detention:* $500,000 in compensatory damages and $500,000 in punitive damages for plaintiff Diego–Francisco on his own behalf.

(5) *Cruel, inhuman or degrading treatment:* $1,000,000 in compensatory damages and $1,000,000 in punitive damages each for plaintiffs Xuncax, Diego–Francisco, and Doe; $500,000 in compensatory damages and $500,000 in punitive damages each for Francisco–Marcos, Juan Ruiz–Gomez, and Miguel Ruiz–Gomez; and $750,000 in compensatory damages and $750,000 in punitive damages for Callejas, each on their own behalf.

## B. *Ortiz's Claims Under the TVPA*

### 1. Compensatory Damages

■ Ortiz seeks compensatory recovery of "in excess of $1,000,000" for the damages she suffered as a result of the acts of torture inflicted upon her by the defendant. (*See* Complaint ¶ 42.) The TVPA does not itself provide any specific guidance regarding the amount of recovery to which a successful litigant under the statute is entitled. Rather, the TVPA leaves to the federal courts the task of determining the proper measure of liability.

A body of precedent under the TVPA has yet to be developed. However, damages for torture and related abuse in violation of international law and sufficiently comparable to the claims presented here by plaintiff Ortiz have been awarded in a number of federal cases predating the TVPA.[45] In light of the

---

44. *See* note 45, *infra.*

45. *See, e.g.,* Ortiz Ex. E, documenting the following cases: *Filartiga v. Pena–Irala,* 577 F.Supp. 860 (E.D.N.Y.1984) (for torture to death: $175,-000 to sister, $200,000 to father in compensation, $5,000,000 to each as punitive damages); *Martinez–Baca v. Suarez–Mason,* No. 87-2057 SC (N.D.Cal., Apr. 22, 1988) (for systematic arbitrary detention and torture: $11,170,699 in com-

pensation (including lost earnings), $10,000,000 in punitive to victim); *Forti v. Suarez,* No. 87-2058–DLJ (N.D.Cal. Apr. 25, 1990) (for first plaintiff, for arbitrary detention, torture, and witnessed abuse and execution of brother: $3,000,-000 compensatory, $3,000,000 in punitive; for second plaintiff, for arbitrary detention, abuse and "disappeared" mother: $2,000,000 in compensation, $1,000,000 punitive); *Trajano v. Marcos,* No. 86-0207, (D.Hawaii, May 19, 1991) (for torture and summary execution: $236,000 in lost

range of compensatory awards found warranted in those cases, I find an award of compensatory damages in the amount of $3,000,000 to be both proper and reasonable, particularly when the torture inflicted on Ortiz is compared to that inflicted on Diego–Francisco.

## 2. Punitive Damages

■ Ortiz requests an award of punitive damages of "at least $1,000,000." (Complaint ¶ 43.) The TVPA by its terms neither explicitly permits nor prohibits the federal district court from granting awards of punitive damages. Section 2(a) of the statute, in relevant part, provides simply that the tortfeasor "shall be liable for damages in a civil action ..." [46] The various federal courts that have adjudicated claims of human rights violations comparable to those asserted by plaintiff Ortiz in this case, however, have all seen fit to issue sizable punitive awards, often in excess of the corresponding compensatory recovery. *See* note 45, *supra.* Indeed, one of these, *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), was quoted with approval in the Senate Committee Report accompanying the TVPA bill. *See* S.Rep. No. 249, 102d Cong., 1st Sess. 4 (1991) at 4 ("Senate Report"). It may be presumed that Congress was not unaware that upon remand of that case the

district court awarded the plaintiffs—father and sister to the victim tortured to death—$5,000,000 in punitive damages each, in addition to a combined compensatory award of $375,000. *See Filartiga v. Pena–Irala,* 577 F.Supp. 860 (E.D.N.Y.1984). This in turn might suggest that in enacting the TVPA, Congress contemplated the award of punitive damages thereunder. *See* Senate Report at 4 (stating that the TVPA "would establish an unambiguous cause of action that has been successfully maintained under ... § 1350").

Further support for this notion can be drawn from an examination of the *Filartiga* language excerpted in the Senate Committee Report. This portion observed in part that:

> Among the rights universally proclaimed by all nations ... is the right to be free of physical torture. Indeed for purposes of civil liability, the torturer has become ... an enemy of all mankind. Our holding today ... is a small but important step in the fulfillment of the ageless dream to free all people from brutal violence.

Senate Report at 4.

To the extent that this language may be taken to inform the purpose of the TVPA legislation, it appears the statute was designed not simply to compensate the victims of torture, but with an eye toward eradicat-

---

earnings, $175,000 moral damages, $1,250,000 exemplary damages to victim's estate; $1,250,000 in compensation, $1,250,000 exemplary to victim's mother); *Siderman v. Argentina,* No. CV–82–1772–RMT (MCx), 1984 WL 9080 (C.D.Cal. Sep. 28, 1984) (for torture: compensatory damages totalling $2,607,575.63 to victim), *vacated on other grounds,* No. CV–82–1772–RMT (MCx) (C.D.Cal. Mar. 7 1985), *rev'd and remanded,* 965 F.2d 699 (9th Cir.1992); *Quiros de Rapaport, et al., v. Suarez–Mason,* No. C87–2266 JPV (N.D.Cal. Apr. 11, 1989) (for torture and murder of one victim, disappearance of another: $10,-000,000 in compensation, $10,000,000 punitive to victims' widows, $5,000,000 in compensation, $5,000,000 punitive to victims' mother and sister, respectively). *See also Todd v. Panjaitan,* No. CV–92–12255–PBS (D.Mass. Oct. 26, 1994) (awarding $2,000,000 in compensation to mother as administratrix of son's estate, $2,000,000 in compensation to mother, and $10,000,000 in punitive damages); *Paul v. Avril,* No. 91–399–CIV (S.D.Fla. July 1, 1994) (awarding six victims of torture and arbitrary detention between $2,500,-000 and $3,500,000 in compensatory damages

each together with $4,000,000 each in punitive damages).

**46.** The plaintiffs contend that "[b]y 1991 it was undoubtedly 'settled law' that tort damages include punitive damages when appropriate" and that therefore a "plain meaning" reading of the statute allows punitive damages. (Plaintiffs' Supp. Mem. at 29 (citation omitted).) In support of this argument, they contrast the TVPA and its use of the word "damages" to 42 U.S.C. § 1983 as discussed in *Smith v. Wade,* 461 U.S. 30, 85, 103 S.Ct. 1625, 1654–55, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting), where the dissent observed that § 1983's use of the words "injured party" and "redress" suggested only a compensatory purpose, not a punitive one. *Id.* at 28–29. While I do not find the contrast with the *Wade* dissent's reading of § 1983 particularly persuasive, I do provisionally accept the argument that in 1991 Congress' use of the word "damages" does not preclude contemplation of both punitive and compensatory awards thereunder. *Cf. Wade,* 461 U.S. at 54, 103 S.Ct. at 1639 (§ 1983 terms permits punitive damages in line with common-law rule where no reason to depart therefrom is shown).

ing the evil altogether. In the civil context, of course, to prevent or deter heinous behavior is the particular province of punitive or exemplary damages. *See, e.g., Restatement (Second) of Torts* § 908(1) (1977) (punitive damages awarded in jury's discretion "to punish [defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future"); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 1041–42, 113 L.Ed.2d 1 (1991) ("[u]nder the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct").

The Supreme Court recently rejected the retroactive application of a statute authorizing punitive damages, however, in *Landgraf v. USI Film Products,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The Court explained that "[t]he very labels given 'punitive' or 'exemplary' damages, as well as the rationales that support them, demonstrate that they share key characteristics of criminal sanctions. Retroactive imposition of punitive damages would raise a serious constitutional question." (citations omitted). The Court also noted: "It will frequently be true, as petitioner and amici forcefully argue here, that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity." — U.S. at — – —, 114 S.Ct. at 1507–08 (footnote omitted).

Based on the reasoning in *Landgraf,* I decline to award punitive damages under the TVPA based on conduct by the defendant that occurred prior to the passage of the statute.

## C. *Plaintiffs' Claims Under Guatemalan Municipal Law*

### 1. Compensatory Damages

The plaintiffs seek the following compensatory awards:

(a) *Wrongful Death:* Plaintiffs Xuncax, Doe, and Pedro–Pascual "on their own behalf and on behalf of their next-of-kin," (Xuncax Complaint ¶ 84), each seek compensatory damages "of at least $2,000,000." (Xuncax Complaint ¶ 87.)

(b) *Assault and Battery:* Plaintiffs Xuncax, Doe, and Diego–Francisco, "on their own behalf and on behalf of their next-of-kin," (Xuncax Complaint ¶ 89), each seek compensatory damages "in excess of $2,000,000." (Xuncax Complaint ¶ 91.) Plaintiff Ortiz seeks compensatory damages "in excess of $1,000,000." (Ortiz Complaint ¶ 55.)

(c) *False Imprisonment:* Plaintiffs Xuncax, Doe, and Diego–Francisco, "on their own behalf and on behalf of their next-of-kin," (Xuncax Complaint ¶ 93), each seek compensatory damages "in excess of $1,000,000." (Xuncax Complaint ¶ 95.) Plaintiff Ortiz seeks compensatory damages "in excess of $500,000." (Ortiz Complaint ¶ 59.)

(d) *Intentional Infliction of Emotional Distress:* Each *Xuncax* plaintiff seeks compensatory damages "in excess of $1,000,000." (Xuncax Complaint ¶ 97, ¶ 101.) Plaintiff Ortiz seeks compensatory damages "in excess of $500,000." (Ortiz Complaint ¶ 65.)

Compensatory damage awards in the Guatemalan civil system consist of two components: "material damages," i.e., recovery for pecuniary loss, and "moral damages," i.e., recovery for nonpecuniary loss. (*See* Garro Aff. ¶ 33, Xuncax Mot. Default Ex. O.) Material damages generally encompass items such as past and future medical expenses and past and future lost income, whereas moral damages cover pain and suffering and other forms of mental anguish. *See id.*

In general, the trial court has great latitude in determining the proper measure of recovery. (*See* Garro Aff. at ¶ 36.) In cases where the plaintiff has suffered bodily injury, the court is required by Article 1655 of the Civil Code to fix the amount of recovery in light of "(1) [the plaintiff's] age, civil status, occupation or profession ...; (2) the obligation of the victim to provide economic support to those entitled according to law; and (3) possibility and capacity of the defendant to pay." (Garro Aff. at ¶ 36.)

As discussed above, with the exception of wrongful death (summary execution and disappearance) no plaintiff may recover on behalf of a relative under the TVPA, Massachusetts law, or Guatemalan law, or, consequently, under 28 U.S.C. § 1350. *See* Part III. C.2.b, *supra.*

Thus, if I were to award damages under Guatemalan law, I would do so in the following manner:[47]

(a) *Wrongful Death:* Plaintiffs Xuncax, Doe, and Pedro–Pascual each would recover $2,000,000 in compensatory damages based on the deaths of their husband, father, and sister, respectively.

(b) *Assault and Battery:* Plaintiff Xuncax would recover $500,000 in compensatory damages, on her own behalf, and Plaintiff Diego–Francisco would recover $1,000,000 in compensatory damages, on his own behalf. Plaintiff Ortiz would recover compensatory damages of $1,000,000.

(c) *False Imprisonment:* Plaintiff Diego–Francisco would recover $500,000 in compensatory damages. Plaintiff Ortiz would recover $1,000,000 in compensatory damages.

(d) *Intentional Infliction of Emotional Distress:* Plaintiffs Xuncax, Diego–Francisco, and Doe would recover $1,000,000 in compensatory damages each; Francisco–Marcos, Juan Ruiz–Gomez, and Miguel Ruiz–Gomez would recover $500,000 in compensatory damages each; Callejas would recover $750,000 in compensatory damages; and Ortiz would recover $1,000,000 in compensatory damages.

Plaintiffs Xuncax, Doe, Pedro–Pascual and Diego–Francisco, however, will be fully compensated for the wrongful death of their relatives based on their international law claims of summary execution and disappearance. With the exception of plaintiff Manuel–Mendez, each of the *Xuncax* plaintiffs will be compensated, under international law doctrines for the suffering intentionally inflicted upon them. Plaintiff Ortiz will be fully compensated under the TVPA for torture, which, in her circumstances, may be analogized to a combination of assault and battery, intentional infliction of emotional distress, and false imprisonment. In short, recovery under Guatemalan law is duplicative of those federal claims for which I have already assessed damages. Because I decline to award duplicative or cumulative compensatory damages, the damage awards under Guatemalan law will be subsumed under the federal claim damage awards.

## 2. Punitive Damages

The *Xuncax* plaintiffs and plaintiff Ortiz seek to recover punitive damages based on defendant's municipal torts. Under the approach of the *Restatement,* which I have adopted, Guatemalan law governs the issue whether punitive damages should be awarded. *See Restatement (Second) of Conflict of Laws* § 171 cmt. d. The affidavit of Professor Garro does not directly indicate whether punitive damages are permissible under Guatemalan law. The plaintiffs argue that "[s]ince international law controls over domestic law in Guatemala, a Guatemalan court hearing a claim for violations of international law would apply international standards to determine damages." (Xuncax Brief in Supp. of Def. Judgt. at 40.) Although Professor Garro does state that "international treaties and conventions agreed to and ratified by Guatemala prevail over domestic law," (Garro Aff. ¶ 38), he states no opinion as to whether this principle would in fact call for the award of punitive damages.

The plaintiffs clearly are correct in arguing that this court, in deciding whether to grant an award of punitive damages, should take into consideration the fact that defendant's willful and malicious violations of Guatemalan

---

**47.** I am somewhat uncomfortable assessing damages under Guatemalan law because, although the issue has not been fully briefed, I presume that, given the differences in standard of living, the damage awards in that country would be less substantial than those in the United States for similar harms. Moreover, the record is not sufficiently developed to permit a nuanced evaluation of the factors contemplated by Article 1655 of the Civil Code. Nevertheless, in the absence of more precise or extensive evidence, (*see* Garro Aff. at 1–4, Pl. Supp. Mem. Ex. B), I have referred to damage awards from United States domestic cases for guidance.

municipal tort laws also constituted egregious violations of international law. Without evidence of the Guatemalan law of punitive damages, however, I cannot make the *initial* determination that punitive damages are permissible at all. In addition, I have already determined to award punitive damages to the *Xuncax* plaintiffs under § 1350 based on Gramajo's violations of international law. Accordingly, I deny plaintiffs' request for punitive damages based on the defendant's violations of Guatemalan municipal law.

### D. *Ortiz's Defamation Claim Under Kentucky Law*

 Kentucky law clearly permits courts to grant both compensatory and punitive damages when warranted. *See Columbia Sussex Corp. v. Hay,* 627 S.W.2d 270, 274 (Ky.1981). In light of the exceedingly derogatory, malicious, and outrageous nature of the defendant's defamatory statements regarding the plaintiff, and in view of the fact that the defendant repeated those statements on numerous occasions, I find a compensatory award in the amount of $1,000,000 and a punitive award in the amount of $1,000,000 to be proper.

### V. CONCLUSION

For the reasons set forth more fully above, the clerk is directed to enter default judgments in favor of all plaintiffs in Civil Action No. 91–11564, except plaintiff Manuel–Mendez, whose complaint shall be dismissed, and in favor of the plaintiff Ortiz in Civil Action No. 91–11612, in the amounts set forth in this Memorandum.